**A. Elihu MICHELSON, Plaintiff,**

v.

**Louis C. DUNCAN et al., Defendants.**

Court of Chancery of Delaware,
New Castle County.

Submitted Oct. 26, 1977.

Decided Feb. 15, 1978.

Joseph A. Rosenthal, of Morris & Rosenthal, Wilmington, and Bertram Bronzaft, of Garwin & Bronzaft, New York City, for plaintiff.

Rodman Ward, Jr. and David B. Ripsom, of Prickett, Ward, Burt & Sanders, Wilmington, for defendant-Household Finance Corp.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, for individual defendants.

HARTNETT, Vice Chancellor.

I

Plaintiff (Michelson) brought suit as a stockholder of Household Finance Corporation ("HFC"). Michelson, who sued derivatively on behalf of HFC, moved for and seeks partial summary judgment on the issue of liability of the individual defendants. The individual defendants, who are present and former members of HFC's Board of Directors and the corporate defendant (HFC), also moved for summary judgment.

Michelson alleges that the individual defendants violated their fiduciary duties to HFC and its stockholders by the unauthorized modification of the terms of HFC's 1966 Stock Option Plan. This resulted in cancellation of certain stock options, the granting of new options at a reduced price, waiver of limitations on the granting of options and the extension of the period during which the options could be exercised without new consideration. Michelson seeks relief to:

(1) declare all options issued subsequent to December 31, 1973, null and void;

(2) order individual defendants to account to HFC for all profits realized on options granted subsequent to December 31, 1973; and

(3) require the individual defendants to account for all losses that HFC sustained as a result of defendants' actions.

On March 2, 1966, the Board of Directors of HFC adopted and approved a stock option plan, subject to approval by its stockholders, which was submitted to it by a compensation committee comprised of non-employee directors. Prior to the 1966 annual stockholders' meeting, stockholders received proxy materials, part of which described the plan, and thereafter overwhelmingly voted their approval of it.

The first part of the plan authorized the grant of tax qualified[1] stock options enabling eligible employees, including employee-directors, to purchase HFC common stock.[2]

The second part of the Stock Option Plan authorized the issuance of stock pursuant to

---

1. See I.R.C. § 422 for the requirements imposed upon a stock option plan in order for it to receive preferential tax treatment.

2. The relevant provisions of the tax qualified plan state:

　1. PURPOSE. The purpose of the Plan is to encourage and enable selected key employees of the Corporation or its subsidiaries to acquire a proprietary interest in the Corporation which will assure a close identification of their interests with those of the Corporation.

2. STOCK. Under the Plan, the Board of Directors is authorized for ten years to grant eligible employees options to purchase under certain conditions and limitations an aggregate of 150,000 shares of the authorized and unissued Common Stock of the Corporation or of the said stock held in the Corporation's treasury. Shares under expired options may be the subject of new options.

non-tax qualified stock options and is identical to the tax qualified plan with a few notable exceptions.[3]

3. ELIGIBILITY. A Compensation Committee of Directors (who are not employees) selects the employees (who may be directors or officers but not members of the Committee) to whom options are to be granted, determines the number of shares for each option, and fixes the terms for exercising each option, all within the limitations of this Plan and the provisions of the Internal Revenue Code relating to "qualified stock options" (as presently defined in Section 422[b]), and amendments thereof or substitutions therefor. Only employees of the Corporation or a subsidiary may be selected. No employees may be granted options during any period of twelve consecutive months to purchase more than 5,000 shares in the aggregate under the Plan and the 1966 Non Tax Qualified Stock Option Plan.

4. TERMS. Options will expire no more than five years from the date of grant and may be exercised in units of 100 shares at the rate of 25% of the shares under option on and after each of the first, second, third, and fourth anniversaries of the date on which the option was granted. On recommendation of the Compensation Committee, the Board of Directors may, for individually selected options, waive either the 25% limitation on exercise or the limitation on number of shares for which options may be granted to an employee, or both, but it may not permit options to be exercised in less than one year or more than five years from the date of grant. By its terms, no option shall be exercisable while there is outstanding any qualified or restricted stock option previously granted to the optionee to purchase stock of this Corporation or any other corporation which (at the time of the granting of such new option) is a subsidiary or parent of this Corporation or a predecessor of this Corporation or of any such subsidiary or parent of this Corporation, provided that any such new option may by its terms be exercisable, despite any such outstanding previously granted option, if (a) all such previously granted options, together with such new option, are to purchase Common Stock of this Corporation and (b) the option price under each such previously granted option (determined as of the date of the granting of such new option) is not greater than the option price under such new option. The purpose of the preceding sentence is to comply with the requirements of subsection 422(b)(5) of the Internal Revenue Code, as modified by subsection 422(c)(6); all words and terms in the said sentence and elsewhere in this Plan and in options granted hereunder which are defined in Sections 421 through 425 of the Internal Revenue Code or Regulations thereunder shall have and be given meanings as so defined, including, without limiting the generality of the foregoing, the word "outstanding"

After adoption and implementation of the Stock Option Plan, recapitalization in the form of stock splits compelled the Board and the definition thereof in subsection 422(c)(2) of the said Code.

5. PRICE. The per-share purchase price shall be at least 100% of the fair market value of one share of Common Stock of the Corporation on the date on which the option is granted and shall be determined by the Board of Directors or its Executive Committee.

\* \* \* \* \* \*

8. ADJUSTMENTS. In the event of corporate changes affecting the Corporation's Common Stock or this Plan or options granted hereunder, the Board of Directors may make appropriate adjustments in price and number of shares subject to option which it deems equitable to prevent dilution or enlargement of option rights, provided that such adjustments do not destroy the status of such options as qualified stock options under the provisions of the Internal Revenue Code relating thereto (and amendments thereof or substitutions therefor).

9. AMENDMENT OF PLAN. The Board of Directors or Executive Committee may from time to time (a) change the aggregate number or remaining number of shares which may be issued under the Plan to reflect a change or changes in capitalization affecting the Common Stock of the Corporation, such as a stock dividend or stock split up, or (b) amend the Plan or any option granted thereunder to the extent deemed necessary or advisable to conform to applicable law or regulation.

10. TERMINATION OF PLAN. The Board of Directors may terminate the Plan at any time by resolution, which, however, may not affect options previously granted under the Plan.

**3.** The relevant provisions of the non-tax qualified Plan state:

\* \* \* \* \* \*

2. STOCK. Under the Plan, the Board of Directors is authorized for ten years to grant to eligible employees options to purchase under certain conditions and limitations an aggregate of 150,000 shares of the authorized and unissued Common Stock of the Corporation or of the said stock held in the Corporation's treasury. Shares under expired options may be the subject of new options.

\* \* \* \* \* \*

4. TERMS. Options will expire no more than ten years from the date of grant and may be exercised in units of 100 shares at the rate of 10% of the shares under option on and after each of the second and following yearly anniversaries of the date on which the option was granted, except that on or after the ninth such anniversary the number of shares subject to exercise under the option shall include the entire 30% thereof not previously subject to exer-

of Directors to increase the number of shares subject to option from 150,000 shares as originally proposed to 450,000 shares. The Board, as vested with authority under the Plan, also increased the number of shares that could be granted to individual employees in any twelve consecutive months from 5,000 shares to 15,000 shares to correspond to the increase in stock created by the split.

. The non-tax qualified plan provided that the option granted could be exercised after the second anniversary of the Plan but only at the rate of 10% per year, except that after the ninth anniversary the optionee could exercise his option on the remaining 30% of the shares. The Compensation Committee had authority, however, to recommend that the exercise limitation be waived on individually selected options. On December 15, 1971, the Board of Directors, acting upon the recommendation and request of the Compensation Committee, amended the option agreements on all outstanding non-tax qualified options, thereby waiving the 10% limitation on exercise, and replacing it with a 12½% limitation. Thereafter, on November 20, 1973, in accordance with the recommendation of the Compensation Committee, the Board of Directors waived the 12½% limitation on the exercise of options and substituted a 33⅓% exercise

limitation after the second, third, and fourth yearly anniversaries of the date the options were granted. This less restrictive limitation, which would permit optionees to exercise all options within a period of five years as opposed to the ten years necessary under the original provisions of the Plan, was placed on all outstanding non-tax qualified options.

By 1974 the market price of HFC common stock had drastically decreased and the Board of Directors decided that necessary measures should be instituted to insure that the incentive value of the Stock Option Plan be maintained.[4]

Following the Compensation Committee's request, a study of HFC's Stock Option Plan was undertaken and a proposal for a plan to grant new, non-tax qualified options were provided to all directors of HFC including members of the Compensation Committee. The Board of Directors approved the Plan, and on April 9, 1974, the Compensation Committee granted new, non-tax qualified options on the condition that the optionee first agree to the cancellation of previously granted non-tax qualified options.[5]

In accordance with the amended plan established by the resolution of April 9, 1974,[6]

---

cise thereunder. On recommendation of the Compensation Committee, the Board of Directors may, for individually selected options, waive either the 10% or 30% limitation on exercise or the limitation on number of shares for which options may be granted to an employee, or both, but it may not permit options to be exercised in less than two years or more than ten years from the date of grant.

5. PRICE. The per-share purchase price shall be at least 90% of the fair market value of one share of Common Stock of the Corporation on the date (a) on which the option is granted or (b) if lower, on which the shares are purchased under the option. Within these limitations such price shall be determined by the Board of Directors or its Executive Committee.

\* \* \* \* \* \*

4. The per-share exercise price of the options which were cancelled on April 9, 1974 ranged from $23.63 to $34.55. The average of the low and high selling price for HFC common stock on the New York Stock Exchange was $16.57 .

per share on April 9, 1974. At the time the Complaint was filed, HFC common stock had risen to approximately $19.00 per share.

5. Authority to grant options was vested in the Compensation Committee by virtue of a resolution of April 14, 1970, in which the Board of Directors unanimously voted to delegate to the Committee the Board's authority to determine stock option policies and grant options to purchase stock.

6. The resolution of the Compensation Committee stated:

RESOLVED, that a non-tax qualified stock option be and it is hereby granted under the provisions of the 1966 Non-Tax Qualified Stock Option Plan to each employee now holding one or more options under said Plan, in each case in the number of shares equal to the total number of shares previously granted to the employee under the Plan, waiving the limitation on the number of shares which

of the Compensation Committee, 304,900 shares previously granted under the earlier non-tax qualified stock option plan were cancelled and new options were granted on 304,900 shares. The exercise price for these newly created options was set at 100% of the fair market value of HFC common stock on the date of the grant which was determined to be $16.57. The Compensation Committee also granted director J. M. Tait an additional option to purchase 15,000 shares of non-tax qualified plan stock, and defendant-director W. E. Wehner an option to purchase 10,000 shares of tax qualified plan stock.

As a result of the Compensation Committee's decision to cancel outstanding options and reissue new options on a one-for-one basis at a lower price, certain defendant-directors were enabled to exchange a like number of options to purchase stock at the price listed, in order to receive options to purchase shares at $16.57 as follows:

| Defendant-Director | Number of Shares | Average Option Price Per Share |
|---|---|---|
| G. R. Ellis | 34,950 | $ 31.80 |
| James M. Tait | 13,350 | 29.06 |
| Paul C. Nagel, Jr. | 37,525 | 23.63 |
| William E. Wehner | 11,650 | 29.46 |
| Joseph W. James | 15,000 | 34.17 |
| L. C. Duncan | 15,375 | 28.09 |
| D. C. Clark | 6,350 | 28.24 |

Thus these seven individuals were granted options to purchase 134,200 shares of the stock at the reduced price out of the total of 304,900 replacement options.

The 1966 non-tax qualified plan set 15,000 shares as the limit upon which options to purchase could be granted during any period of twelve consecutive months, subject to waiver by the Board of Directors on the recommendation of the Compensation Committee for individually selected options. The 15,000 share limitation provision was generally waived by the Board of Directors on January 28, 1971, and again on September 14, 1972; and later the Compensation Committee to which the necessary power had been delegated, waived the limitation on April 9, 1974, and also on September 11, 1974.[7] Defendants-Duncan, Ellis, James, Rasmussen, Nagel, Tait, Wehner, and Steffy were each granted options to purchase in excess of 15,000 shares of stock within individual 12-month periods[8] from 1967 through 1974.

Between April 9, 1974, and April 12, 1975, HFC granted options to purchase 125,000 shares of stock pursuant to the tax qualified plan and options to purchase 71,800 shares pursuant to the non-tax qualified plan all in addition to the 304,900 options which had been granted, cancelled, and again granted at a lower exercise price. During this same period, options to purchase 45,625 shares under the non-tax quali-

---

may be granted to an employee in those instances where this is necessary, and the officers are hereby authorized and instructed on behalf of the Corporation to execute and deliver forthwith to, each of the said employees a stock option agreement in the prescribed form, provided, however, that in each case the option granted hereby to the employee is conditioned and contingent upon the agreement of the employee to the cancellation of all previously granted options to the employee under the 1966 Non-Tax Qualified Stock Option Plan.

7. In the resolutions granting a waiver of the 15,000 share limitation, the Board of Directors and the Compensation Committee waived "the limitation on the number of shares which may be granted to an employee in those instances where this is necessary . . .". The waiver was couched in general terms rather than indicating a waiver on individually selected option as required by the stock option plan. The Compensation Committee was authorized to act by a board resolution. See note 5 supra.

8. The following is a summary of the transactions which granted the above-named individuals greater than 15,000 shares within twelve month periods (adjusted for the August, 1972, stock split):

| | Dates of Grant | Total Options |
|---|---|---|
| L. C. Duncan | 6/12/73–4/7/74 | 18,375 |
| G. R. Ellis | 1/26/71 | 22,275 |
| | 4/11/72–4/10/73 | 32,775 |
| | 4/10/73 | 20,100 |
| | 4/9/74 | 34,950 |
| | 9/11/74 | 35,000 |
| J. W. James | 6/22/73–4/9/74 | 30,000 |
| A. E. Rasmussen | 11/30/67 | 75,000 |
| | 9/14/72 | 45,000 |
| P. C. Nagel, Jr. | 1/26/71 | 19,800 |
| | 6/12/73–4/9/74 | 47,525 |
| J. M. Tait | 4/9/74 | 28,350 |
| W. E. Wehner | 6/12/73–4/9/74 | 25,650 |
| A. O. Steffy | 1/21/69 | 37,250 |

fied plan and 64,900 shares under the tax qualified plan expired.

In 1974 and 1975, no options to purchase were exercised. From January 1, 1976, to July 29, 1976, 600 shares of stock were purchased with tax qualified options and 1,600 shares were purchased with non-tax qualified options. None of these options, however, were among those granted on April 9, 1974, as part of the cancellation and reissuance of options. On April 12, 1976, authority to grant stock options under both the tax qualified and non-tax qualified plans expired, at which time the number of shares which remained available but unused for options was 7,375 under the non-tax qualified plan and 4,000 under the tax qualified plan.

Apparently, in response to the institution of the present suit, defendants sought and received stockholder ratification at the annual meeting held on April 12, 1977. The non-unanimous ratification[9] approved a resolution which attempted to "approve, authorize, ratify and confirm" the following actions already taken:

(1) the adjustment of the number of shares subject to the stock option plan to reflect the three-for-two split of common stock on August 14, 1972;

(2) the delegation by the Board of Directors to the Compensation Committee of its authority to determine which employees were to receive options, the number of options they were to receive, and to fix the terms under which they were to be exercised;

(3) allowing non-tax qualified options to be exercised at 90% of the fair market value of the common stock on the date the option was granted or, if lower, on the date on which the shares were purchased under the option; and that such price could be determined by the Board of Directors;

(4) changing the aggregate shares within the purview of the stock option plan to reflect changes in capitalization;

(5) cancellation of non-tax qualified options covering 304,900 shares with exercise prices ranging from $23.63 to $35.57 per share and granting new non-tax qualified options on 304,900 shares at an exercise price of $16.57 to optionees among whom were included the individual defendants in this case;

(6) changing the number of shares which could be exercised after the second anniversary of the date of the option from 10% to 12½%, and later to 33⅓%;

(7) the waiving on four separate occasions, of the exercise limitation on the number of shares under the non-tax qualified plan which could be granted to an employee; and

(8) the waiving on six separate occasions, of the number of shares which could be granted under the tax qualified plan.

Proxies were obtained for all the shares voted in favor of the resolution and on all but twenty shares which were voted against ratification. The proxy statement, part of which solicited votes on the issue of ratification, described in detail the stock option plan, the present litigation, and the actions which led to this lawsuit. The proxy statement also contained the complete text of the Stock Option Plan and the Complaint in its appendix.

The issue to be determined therefore is whether the after-the-fact stockholder ratification in 1977 legally cured any possible legal challenges to the revisions of the Stock Option Plan and the waivers agreed to by the Board of Directors without prior stockholder approval.

## II

▉▉▉ As a general rule, stock option plans are an acceptable and necessary means by which corporations gain the services of new employees and retain the services of valued employees. Stock options are provided for in Delaware law by 8 *Del.C.* § 157, and every corporation may issue options, the terms of which must be either in the Certificate of Incorporation or in a reso-

---

9. The vote was 32,670,527 shares voted in favor of the resolution, and 2,444,172 shares vot-

ed against the resolution. 2,609,521 shares were not voted on the proposed resolution.

lution adopted by the Board of Directors. Furthermore, 8 *Del.C.* § 157 provides *inter alia:*

> In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.

### III

■ It is also a general rule of law that ratification by a majority of stockholders binds a corporation to unauthorized acts by a Board of Directors if such acts could have been authorized by the stockholders in the first instance, since ratification cures a voidable wrong. *Kerbs v. California Eastern Airways*, Del.Supr., 90 A.2d 652 (1952). Ratification relates back to the time of the occurrence of the act which was ratified, and is thus equivalent to original authority. *Hannigan v. Italo Petroleum Corporation of America*, Del.Supr., 47 A.2d 163 (1945).

■ Under most circumstances majority stockholder approval is all that is necessary; however, unanimous stockholder ratification must be obtained where it is alleged that there has been a waste or gift of corporate assets. *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962); *Kerbs v. California Eastern Airways*, supra; 2 Fletcher, *Cyclopedia of Corporations* § 764 (Perm.Ed. Rev.1969).

Michelson argues that the 1966 Plan, which was approved by the stockholders in 1977 was violated in 1973 and 1974 when the Board of Directors, without prior stockholder approval, made substantial amendments to the Plan. He argues that the 1973 and 1974 amendments to the Plan were contrary to the provisions of the Plan as approved by the stockholders in 1966. Michelson does not, however, argue that the amendments of the Plan constitute a corporate gift of assets.[10] The corporate waste theory was argued and rejected in *Dann v. Chrysler Corp.*, Del.Ch., 198 A.2d 185 (1963),

aff'd sub nom. *Hoffman v. Dann*, Del.Supr., 205 A.2d 343 (1963) *cert. denied,* 380 U.S. 973, 85 S.Ct. 1332, 14 L.Ed.2d 269. In that case, this Court approved the settlement of a derivative action brought to attack the cancellation of certain stock options followed by the issuance of new options at a lower option price. Although in *Dann* the change in the stock options, by cancellation and issuance of new options at a lower price, was not of the magnitude of the changes in the present case, *Dann* does support the view that the cancellation of stock options and reissuance at a lower price is not *per se* a gift or waste of corporate assets. *Dann* arose in the context of the approval of a contested settlement. The Chancellor stated:

> A number of Delaware decisions I think support the view that where stock options are granted by a disinterested committee with the approval of the directors and stockholders and where the optionee is required to remain in the employ of the corporation for an extended period of time, no legal attack may successfully be made upon such options. See, e. g., *Gottlieb v. Heyden Chemical Corporation*, 33 Del.Ch. 177, 91 A.2d 57; *Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731. One may have difficulty reconciling the practice of reissuing options at lower prices with the "incentive" aspect of the earlier grants. Nevertheless, the court would not be inclined to block reasonable corporate action in this area, particularly in view of the need of corporations to retain talented personnel. 198 A.2d at 195.

Unlike what occurred in *Dann*, in the present case there was no stockholder approval until long after the Plan was amended and the question therefore arises whether a ratification by stockholders can be substituted for initial stockholder approval.

If Michelson, in good faith, had alleged that there had been a waste or gift of corporate assets and had presented suffi-

---

**10.** On page 28 of his Opening Brief Michelson said: "In any comparison between *Dann* (*Dann v. Chrysler Corp.* infra) and the instant case it must be borne in mind that the objector in *Dann* proceeded on a 'corporate waste' theory, whereas plaintiff in the instant action asserts a director sanctioned violation of the 1966 plan."

**1152**

cient evidence to raise an issue of fact, defendants' Motion for Summary Judgment might have to be denied.

■ This Court in *Gottlieb v. McKee,* Del.Ch., 107 A.2d 240, 243, stated:

The determination of whether or not there has been in any given situation a gift of corporate assets does not rest upon any hard and fast rule. It is largely a question of fact.

If a material issue of fact exists, a motion for summary judgment must be denied. *Gamble v. Penn Valley Crude Oil Corp.,* Del.Ch., 104 A.2d 257 (1954); *Nash v. Connell,* Del.Ch., 99 A.2d 242 (1953); *Hurtt v. Coleburn,* 330 A.2d 134 (Del.Supr.1974).

■ When stockholders ratify a transaction, however, the directors of the corporation are relieved of the burden of proving the fairness of the transaction, and the burden shifts to those who object to the act to convince the Court that no person of ordinary, sound business judgment would be expected to view the consideration received by the corporation as a fair exchange for the value which was given. *Gottlieb v. Heyden Chemical Corporation,* Del.Ch., 91 A.2d 57 (1952); *Kaufman v. Schoenberg,* Del.Ch., 91 A.2d 786 (1952). Where gift or waste of corporate assets is alleged and sufficient facts to support the allegation are present, the Court is charged with the responsibility of examining all the facts surrounding the acts notwithstanding independent stockholder ratification, and then if it finds that ordinary businessmen might differ as to whether or not the corporation was adequately compensated, the Court must validate the transaction. *Saxe v. Brady,* supra.

However, Michelson has not alleged a gift or waste of corporate assets and in fact candidly cedes that he does not rely on such a claim.

## IV

■ It should be noted that decreasing the price of options is not ipso facto a waste of corporate assets.[11] In *Amdur v. Meyer,* 15 A.D.2d 425, 224 N.Y.S.2d 440 (3d Dept. 1962), summary judgment was granted in favor of defendant-directors who were charged with making a gift of assets after they had decreased the price of stock options from $50 to $47.14 per option following a stock dividend. Each option agreement contained a provision for adjusting the option price in response to stock splits, but there was no similar provision to reflect stock dividends. Following stockholder ratification, the Court found that no triable issue was presented, in that the directors had acted within the course of ordinary business management, there was no showing of fraud, bad faith or negligence, and the action taken was a reasonable response to changed conditions. It was held that there was not a gift of assets because the reduction of the option prices was something from which the corporation might reasonably expect a benefit to flow to the corporation.

Here the acts of the individual defendants in modifying the Stock Option Plan were subsequently ratified by an overwhelming vote of approval by the stockholders. If the ratification process was proper, in the absence of any allegation or showing of a gift or waste of corporate assets the ratification disposes of the allegations of Michelson.

## V

■ It should be noted that Michelson's contention that the 1966 plan was violated in that there was no provision in it for cancellation and reissuance of options appears well-founded although of no legal importance in view of the stockholder ratification. Termination is provided for in Para-

11. But see *Goldsholl v. Shapiro,* CCH Fed.Sec. L,Rep. ¶ 95,676 (S.D.N.Y.1976) in which the court refused to allow the parties to settle a dispute which resulted from the board of directors cancellation of stock options held by two directors at $26.49 per share and the grant

of options to five directors at $7.75 per share. The court stated:

"The issue of whether the benefits to the defendants bore any reasonable relation to the extent of their services presented unresolved issues of fact and law." Id. at 90,320.

graph 10 of the tax qualified and non-tax qualified portions of the plan, but clearly, even by the most liberal definition of "termination" there was no authority given to immediately reissue terminated options.

In *Waltzer v. Billera*, CCH Fed.Sec. L,Rep. ¶ 94,011 (S.D.N.Y.1973), a case applying Delaware law, it was held that an amendment to a stock option plan which reduced option prices from between $20.50 and $34.50 per share to $12.00 per share was void. The directors, who did not seek or obtain shareholder approval, lowered the price of the options to regain the plan's incentive objectives. The Court reasoned that by the terms of the plan, new options could not be granted until the first option expired or was terminated. The Court added that the facts did not indicate deception, but rather what was involved was a breach of common law fiduciary duties. A breach of common law fiduciary duties is, however, cured by stockholder ratification. Cf. *Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311, 321 (1952).

Similarly, in *Jacoby v. Averell*, CCH Fed. Sec.L,Rep. ¶ 94,360 (S.D.N.Y.1974), a case described by the Court as being on "all fours" with *Waltzer*, the Court again held that modification of a stock option plan which would allow options to be exercised at a lower purchase price to reflect the diminished current market value of stock was null and void on the grounds that consecutive, tandem, or new options were not contemplated by the plan. Of added import to the Court's decision was the fact that the compensation committee consisted of three directors who were optionees, and the Board of Directors consisted of five directors who were optionees. In that case, however, there was no stockholder ratification.

**VI**

Michelson points out that the proxy statement in which the 1966 Plan was described for stockholder approval failed to include any provision for termination.[12] Although, contrary to Michelson's assertion, I find that the 1966 proxy statement was merely a description of the Plan and obviously not the Plan itself, nonetheless, Michelson is correct that the actual Plan, although providing for terminations, does not provide for reissuance of the terminated options.

However, there is authority for upholding the cancellation of options and the reissuance of new options if there is stockholder ratification, even if such ratification is retroactive. This also holds true as to the other acts which were committed without authority, including the various waivers of limitation on number and rate of exercise. *Hannigan v. Italo Petroleum Corporation of America*, supra.

**VII**

Next to be disposed of is Michelson's contention that the stockholder ratification of the alleged wrongdoing was defective. He claims that the proxy materials failed to disclose:

(1) that the expiration clause which was relied on by defendants was never submitted to or approved by the stockholders and was never part of the 1966 Plan;

(2) that the expiration clause did not permit cancellation and reissuance of options at reduced prices;

(3) that a provision in an earlier 1963 stock option plan which expressly permitted reducing the price of outstanding op-

12. As further evidence that the "termination" provisions in the 1966 Plan did not authorize cancellation and reissuance of options, and perhaps did not envision such action, HFC's previous stock option plan of 1963 specifically provided for such a procedure. The proxy statement for the 1963 Plan provided:

Although the Board of Directors has made no determination with respect to action to be taken in the event of market fluctuations, it is the duty of the Board to devise ways and means to provide adequate incentive to attract and retain the best management talent available. In this effort, the Board reserves the right, with optionee approval, to cancel and reissue options at a lower market price. The Board of Directors may terminate the Plan at any time by resolution which, however may not affect outstanding options.

**1154**

tions to reflect any possible decline in market price of HFC stock was not included in the 1966 Plan;

(4) that six of the nine directors present at the April 9, 1974, board meeting at which cancellation and reissuance was authorized were interested;

(5) that the compensation committee which granted the new options to replace those which had been cancelled was comprised of interested directors and directors dominated by management;

(6) that members of management initiated the cancellation and reissuance of options and were its major beneficiaries; and

(7) that the compensation committee abdicated its duty to administer the 1966 Plan so as to reflect the value of each optionee's future services.

In light of *Lynch v. Vickers Energy Corporation*, Del.Supr., 383 A.2d 278 (Decided Oct. 18, 1977), any contention that a proxy solicitation failed to completely inform stockholders must be given careful scrutiny. Our Supreme Court, in holding in *Vickers* that the standard for disclosure consists of all relevant facts, stated:

Completeness, not adequacy, is both the norm and the mandate under present circumstances.

It is my opinion, however, that there was complete candor in the disclosure of the facts which a reasonable stockholder would consider important in making an informed decision to ratify the transactions at issue, and that defendants have met the burden of showing complete disclosure of all the germane facts. *Cahall v. Lofland*, Del.Ch., 114 A. 224 (1921), aff'd., Del.Supr., 118 A. 1 (1922); *Lynch v. Vickers*, supra. I find that the stockholders were informed of the essential facts surrounding the instant suit. They were provided with the complete text of plaintiff's complaint, and, all alleged wrongs for which ratification was sought were enumerated in detail.

Michelson's allegation of seven deficiencies in the proxy disclosure are discussed seriatim:

(1) The first allegation that the proxy materials failed to disclose that the expiration clause was never part of the plan approved by stockholders in 1966 is factually incorrect. As already stated in this Opinion, the 1966 proxy statement was plainly a description of the stock option plan and was clearly not intended to represent the Plan. Therefore, it was unnecessary for defendants to inform stockholders that the expiration clause was never part of the 1966 Plan. Contrary to plaintiff's contention, the clause was the last of the Plan's provisions.

(2) (3) The allegations that the proxy statement failed to reveal that the expiration clause did not permit cancellation and reissuance of options at reduced prices, and that a provision in the 1963 Stock Option Plan, unlike the 1966 Plan, authorized a reduction of the price of options if market conditions so required, disregards the fact that defendants have taken the position in this litigation that the actions complained of were authorized by the Plan. Any statement to the contrary in the proxy materials would have constituted an admission. As an equally effective alternative, defendants included in the proxy statement a complete text of the Complaint which thereby fully disclosed to HFC's stockholders the assertion made by Michelson that such actions were unauthorized.

(4) There is no factual support for Michelson's claim that six of nine directors at the April 9, 1974, board meeting were interested, and therefore there is no basis for these objections to the proxy statement. Of the fifteen directors elected April 9, 1974,[13] only eight defendants (Duncan, Ellis, James, Nagel, Rasmussen, Tait, Trow and Wehner) had an interest in the Stock Option Plan vote. Furthermore, the minutes of the board meeting indicate that defendants-James, Nagel, Tait, Trow and Wehner withdrew from the meeting prior to the vote. Of the nine directors who remained and voted unanimously for the grant of

13. The directors of the HFC were Messrs. Duncan, Ellis, Flynn, James, Kartalia, Nagel, Osler, Rasmussen, Ranch, Steffey, Tait, Trow, Upton, Wehner and Whitehead.

new options, only Duncan, Ellis, and Rasmussen had an interest by virtue of their eligibility to receive options. Although directors Rasmussen and Steffey owned qualified options, they were not eligible to benefit from the board's action of April 9, 1974.

(5) Similarly, the compensation committee was not comprised of interested directors, and therefore there was not in fact an omission as proposed by the fifth claimed non-disclosure. The compensation committee consisted of directors Steffey, Upton and Whitehead. At the committee's April 9, 1974, meeting, at which time the new options were granted, the only members present were Steffey and Whitehead, both of whom were disinterested. Although defendants Ellis and Duncan were also present, they were not committee members and thus had no authority to vote. Thus, Michelson's contention that the proxy for ratification was defective because it failed to inform stockholders that the compensation committee was interested and controlled by management is without merit.

(6) The members of management who were the beneficiaries of the cancellation and reissuance of the options were clearly named in the proxy statement. The sixth allegation of omission in the proxy materials is without foundation.

■ (7) Lastly, the failure to include a statement that the compensation committee abdicated its duty to administer the Plan so as to reflect the value of each optionee's future services (the seventh alleged non-disclosure), calls for a legal conclusion rather than a fact known to defendants. The question of whether compensation was based upon the value of future services is a question of the adequacy of the consideration, a legal question, and is not a fact requiring disclosure. Furthermore, such a statement would constitute an admission of wrong-doing before it was properly determined in a court of law whether options had been granted for inadequate consideration. The requiring of such an admission would be impractical. The reprint of the Complaint served to completely inform the stockholders of these facts.

Thus, I hold that the ratification was intrinsically valid.

## VIII

■ Next, Michelson contends that defendants breached their fiduciary duty by delegating authority to the compensation committee to grant options. This argument is totally without merit. 8 *Del.C.* § 141(c) clearly states, in part:

> Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which require it . . .

See also, *Kaufman v. Shoenberg*, Del.Ch., 91 A.2d 786, 795–96 (1952).

## IX

■ I must also consider whether the recent Delaware Supreme Court case of *Singer v. Magnavox Company*, Del.Supr., 380 A.2d 969 (1977) changes the settled rule of law in Delaware that stockholder ratification cures any challenged acts of the Board of Directors which do not amount to a gift or waste of corporate assets.

I think not. That case dealt with a corporate merger where the alleged sole purpose was to freeze out the minority stockholders. In that case Justice Duffy said:

> In such a situation, if it is alleged that the purpose is improper because of the fiduciary obligation owed to the minority, the Court is duty-bound to closely examine that allegation even when all of the relevant statutory formalities have been satisfied. Id. at p. 979.

The Court did not have before it the question of stockholder ratification. I do not think *Singer* changes the settled law in Delaware as to stockholder ratification. If the stockholders, after receiving a disclosure of all germane facts given with complete candor, cannot ratify an act by the

Board of Directors not constituting a gift or waste of corporate assets, corporate democracy is meaningless.

Here the stockholders, after receiving a full disclosure of all germane facts, overwhelmingly ratified the acts of the Board of Directors in modifying certain stock option plans. There has been no allegation or showing of any gift or waste of corporate assets. The ratification of the stockholders is therefore binding.

## X

Finally, although not necessary to a resolution of this matter, I comment on the individual defendants' assertion that they are not liable because Michelson has failed to rebut the presumption that as directors they have acted in good faith and with the best interests of the corporation in mind. See *Warshaw v. Calhoun*, Del.Supr., 221 A.2d 487 (1966); *Puma v. Marriott*, Del.Ch., 283 A.2d 693 (1971). Further, the individual defendants contend that in attempting to attach personal liability to defendants, Michelson has failed to show that the individual defendants acted recklessly in interpreting and administering the 1966 Stock Option Plan. Instead, they insist, the directors asked and received answers to questions pertaining to the propriety, feasibility, and necessity of cancelling existing options and granting new options; and that the directors were entitled to rely on the report which HFC's management submitted to them after a thorough study. See 8 *Del.C.* § 141(e) which specifically provides that directors are fully protected in relying in good faith on reports made by officers.

This defense of the individual defendants does not have to be ruled upon, however, because of the stockholder ratification and the lack of any allegation or evidence of a gift or waste of corporate assets.

The motion of the defendants for summary judgment is granted. The motion of plaintiff for summary judgment is denied.

So ordered.