148 F.3d 711
 135 Lab.Cas. P 58,413, 22 Employee Benefits
Cas. 1670
 MUNSON TRANSPORTATION, INCORPORATED,
Plaintiff-Counter/Defendant-Appellee,
v.
Fred G. HAJJAR, Defendant-Counter/PlaintiffThird/Party
Plaintiff-Appellant,
v.
Courtney J. MUNSON, Heartland Incorporated, and Acquisition
Corporation, Third/Party Defendants-Appellees.
 No. 97-2238.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 16, 1998.
Decided June 18, 1998.
 
 Steven C. Rueckert (argued), Chicago, IL, for Plaintiff-Appellee.
 Peter H. Lousberg (argued), Lousberg, Kopp & Bonnett, Rock Island, IL, for Fred G. Hajjar.
 Steven C. Rueckert, Chicago, IL, for Courtney J. Munson, Heartland Incorporated and Acquisition Corporation.
 Before CUMMINGS, BAUER and EVANS, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 Appellant Fred Hajjar appeals from the district court's grant of summary judgment to the appellees on their complaint and on Hajjar's counterclaims and third-party complaint. Finding that material questions of fact exist and that the district court misapprehended the basis for Hajjar's claims, we reverse.BACKGROUND
 
 
 2
 In 1991, appellant Fred Hajjar ("Hajjar") was engaged in a consulting business when he was introduced to appellee Courtney Munson, president and principal shareholder of appellee Munson Transportation, Inc. ("Munson"), a trucking firm based in Monmouth, Illinois (and incorporated in the state of Delaware). Munson was experiencing some degree of financial trouble, and it hired Hajjar as a consultant in approximately October 1991. At the time, Hajjar and his family lived in Massachusetts. In approximately January 1992, Courtney Munson invited Hajjar to join the company as an employee. To this end, Hajjar and Courtney Munson negotiated an employment contract (the "employment agreement") setting forth the terms of Hajjar's employment. As part of their agreement, Hajjar was to move his family to the Monmouth or Galesburg, Illinois area and in return would receive a base salary of $3,000 per week, a bonus based on the profits of Munson, and a certain amount of vacation time. The agreement provided that if Hajjar was terminated within the first three years of his employment, he would receive a certain percentage of his salary as a severance package. Finally, the agreement stated that:
 
 
 3
 Stock options are granted for 6% of the outstanding stock as of Jan. 1, 1992. Price of the options are the book value of the stock as of Jan. 1, 1992. Vesting of a third of the options (2% of outstanding stock) will occur on the first, second and third anniversary dates. Once vested the options will have a seven year term. In the event of a significant influx of equity (IPO, major private placement, merger, etc.) the full 6% will vest on the transaction date.
 
 
 4
 See Hajjar Appendix ("App.") at 10. The employment agreement was signed by both Hajjar and Courtney Munson on May 5, 1992, and specified that January 6 was Hajjar's anniversary date of employment.
 
 
 5
 Things apparently went relatively smoothly until June or July of 1993, when Courtney Munson informed Hajjar that he was going to be terminated. True to his word, Courtney Munson fired Hajjar on approximately September 2, 1993. Although the employment agreement provided that Hajjar was to receive the severance pay in a lump-sum, Courtney Munson and Hajjar agreed that Hajjar would be paid in weekly installments instead. Hajjar was paid pursuant to the agreement for several weeks, after which the payments stopped. Hajjar inquired about this to Courtney Munson, who informed him that he would not pay the total severance amount. Hajjar and Courtney Munson eventually entered into a written settlement agreement on several matters, including severance pay, outstanding salary, unpaid vacation time, and relocation assistance. Hajjar received a check for $16,182, which stated that it was for "final settlement of severance and all other obligations."
 
 
 6
 In February 1994, Munson was acquired by appellee Heartland, Inc. ("Heartland"), which is held by appellee Acquisition Corp. ("Acquisition"), a Nebraska holding company. In that same month, Hajjar attempted to exercise the stock options granted to him in the employment agreement, but Munson refused. Munson then filed a declaratory judgment action against Hajjar in the Circuit Court of Warren County, Illinois, seeking a ruling that Hajjar had no right to exercise the options. Munson claimed that the settlement reached between Courtney Munson and Hajjar had settled all of Munson's outstanding obligations to Hajjar, that the employment agreement did not constitute a valid stock option plan under Delaware law, and that Hajjar had failed to exercise the options in a timely manner. Hajjar removed the case to the United States District Court for the Central District of Illinois, and filed several counterclaims against Munson and third-party claims against Heartland, Acquisition, and Courtney Munson.
 
 
 7
 After some discovery, Munson filed a motion for summary judgment on November 26, 1996, arguing that an accord and satisfaction had been reached between Munson and Hajjar when Hajjar deposited the check stating that it was a "final settlement of severance and all other obligations" and that Hajjar had not exercised his options within the time prescribed by a 1987 stock option plan. Judge Joe B. McDade denied this motion on February 26, 1997, finding that genuine issues of fact existed on the purported accord and satisfaction and that the other issues had not been adequately briefed by the parties. Judge McDade gave Munson and the other appellees leave to file another motion for summary judgment, which they did on March 17, 1997. In this motion, the appellees asserted that all of Hajjar's claims failed to state a claim and realleged that an accord and satisfaction had been reached by the parties. Judge McDade granted this motion, finding that Hajjar's employment agreement did not constitute a valid grant of options under Delaware law and that Hajjar's claims failed as a matter of law. Judgment was entered for the appellees and against Hajjar on Munson's complaint and on all of Hajjar's counterclaims and third-party claims on April 29, 1997, and Hajjar filed a notice of appeal.
 
 DISCUSSION
 
 8
 We review the district court's grant of summary judgment de novo. McGinn v. Burlington Northern Ry. Co., 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We view the record and extract all reasonable inferences from it in the light most favorable to the nonmoving party. McGinn, 102 F.3d at 298 (citations omitted). Only disputes that could affect the outcome of the suit under governing law will preclude an entry of judgment for the moving party. Id. Before we address the merits of Hajjar's appeal, a matter of jurisdiction must be addressed.
 
 I. Jurisdiction
 
 9
 After oral argument in this case, we discovered a potential jurisdictional problem and ordered the parties to brief the issue. Specifically, the potential problem was that, while the district court's judgment purported to be "final," it appeared that several issues raised by the parties had not been addressed by the court. We were concerned as to whether we had jurisdiction under 28 U.S.C. § 1291, the basis asserted by Hajjar. We have now determined that jurisdiction is in fact proper. The judgment entered by the district court stated that it was entered in favor of the appellees and against Hajjar "on the original claim for declaratory relief as well as all counterclaims" and third-party claims, and stated that "[t]his case is terminated." See App. at 508. When determining the finality of a judgment, we look to the judgment's language. If the language used is calculated to conclude all the claims before the district court, the judgment is final. Armstrong v. Trico Marine, Inc., 923 F.2d 55, 58 (5th Cir.1991); see also United States v. Ettrick Wood Prods., Inc., 916 F.2d 1211, 1216 (7th Cir.1990) (per curiam) (judgment is final if it ends the litigation and leaves nothing to be decided in the district court). Since the judgment at issue here stated that it terminated the case, it is a final judgment for purposes of § 1291 and we properly have jurisdiction over this appeal.
 
 II. Employment Agreement
 
 10
 Turning to the merits of this appeal, Hajjar first argues that the district court erred in finding that his employment agreement with Munson, which set forth the fact that he was to receive certain stock options, did not constitute a valid stock option plan and did not provide Hajjar with any option rights. The employment agreement stated that:
 
 
 11
 Stock options are granted for 6% of the outstanding stock as of Jan. 1, 1992. Price of the options are the book value of the stock as of Jan. 1, 1992. Vesting of a third of the options (2% of outstanding stock) will occur on the first, second and third anniversary dates. Once vested the options will have a seven year term. In the event of a significant influx of equity (IPO, major private placement, merger, etc.) the full 6% will vest on the transaction date.
 
 
 12
 See App. at 10.
 
 
 13
 The Delaware Supreme Court has determined that "[t]he issuance of stock option plans by Delaware corporations involves the internal affairs of a Delaware corporation and is, therefore, controlled by the laws of Delaware." Beard v. Elster, 160 A.2d 731, 735 (Del.Supr.1960). So we look to Delaware law to determine whether the Munson-Hajjar employment agreement constitutes a valid grant of stock options to Hajjar. On this subject, Delaware law is as follows:
 
 
 14
 Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to purchase from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.
 
 
 15
 The terms upon which, including the time or times which may be limited or unlimited in duration at or within which, and the price or prices at which any such shares may be purchased from the corporation upon the exercise of any such right or option, shall be such as shall be stated in the certificate of incorporation, or in a resolution adopted by the board of directors providing for the creation and issue of such rights or options, and, in every case, shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options. In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.
 
 
 16
 Del.Code Ann. tit. 8 § 157 (1997). The district court found that the employment agreement failed to meet these requirements, specifically because the options were not "evidenced by or in such instrument or instruments as shall be approved by the board of directors." Mem. Op. at 6. Hajjar contests this finding on appeal.
 
 
 17
 The main issue contested by Hajjar is the issue of ratification: was the employment agreement "adopted" by the Munson Board of Directors, as required by Delaware law? As part of his argument, Hajjar contests the district court's refusal to consider (as admissible evidence) a document entitled "Consent in Lieu of the 1992 Annual Meeting of the Board of Directors of Munson Transportation, Inc."[1] This document stated that "all of the acts and transactions of the officers of the Corporation, in the name and on behalf of the Corporation since the last meeting of the Board of Directors dated November 22, 1991, are hereby in all respects ratified, confirmed and approved." See App. at 206. The district court observed that this purported consent was unsigned and, therefore, was inadmissible in the current proceedings. On appeal, Hajjar argues that this decision is erroneous. While we only review a district court's evidentiary decisions for an abuse of discretion, United States v. Johnson, 127 F.3d 625, 630 (7th Cir.1997), the court below did not cite any authority for its decision and we are unsure of its basis. The mere fact that a document is unsigned does not render it per se inadmissible; if the party seeking admission is able to lay a proper foundation for the exhibit, it can be received. See Haygood v. Auto-Owners Ins. Co., 995 F.2d 1512, 1518 (11th Cir.1993) (unsigned document inadmissible because party failed to lay proper foundation for its admission at trial). The record does not show that Hajjar or Munson attempted but failed to lay a foundation for the admissibility of the document, and it does not demonstrate that the document is necessarily inadmissible. The court's decision to exclude the evidence is thus based on incomplete information and constitutes an abuse of discretion.[2]
 
 
 18
 Conflicting evidence, other than the purported consent, was submitted by the parties on the issue of ratification. In its memorandum in support of summary judgment and its Statement of Undisputed Facts, Munson admitted that the Hajjar employment agreement was signed by Courtney Munson in his capacity as president of the company and that the actions taken by corporate officers during 1992 were ratified by the Board of Directors in 1993. See, e.g., App. at 60 pp 9-10. Surprisingly, Hajjar contested this factual assertion, arguing that Munson failed to produce "any executed action by the Board of Directors to approve the grant of options." See App. at 357-58 pp 9.4 and 10; App. at 426 p 9. On appeal, Hajjar has taken Munson's assertion of ratification to heart, arguing that the ratification "would include the Hajjar employment agreement." Appellant's Brief at 15. While the appellees argue that this is an impermissible flip-flop, Hajjar states, and the record supports, that he merely took alternative positions on the matter (i.e., asserting the ratification was valid with respect to his claims against Munson, but asserting that it was invalid for his alternative claim against Courtney Munson personally). See Rec. Doc. 83 at 4-5. Because the parties took conflicting positions on whether the ratification instrument is valid and whether it covered the purported grant of stock options in the Hajjar employment agreement, there are contested issues of fact which the district court impermissibly resolved on a motion for summary judgment.
 
 
 19
 Hajjar presented another ratification argument which was not considered by the district court. See Rec. Doc. 83. Citing Michelson v. Duncan, 386 A.2d 1144 (Del.Ch.1978) and Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co., 156 A. 350 (Del.Super.Ct.1931), Hajjar appears to repeat his argument that an unauthorized grant of stock options can be ratified by the Board of Directors, curing any legal deficiencies. The cases cited by Hajjar, however, support a different idea; that is, that shareholders (as opposed to the Board) can ratify an unauthorized grant of options. See Michelson, 386 A.2d at 1151. The appellees also noted this fact in their brief to this court. See Appellees' Brief at 6 (stock option plans may be approved by the Board of Directors or ratified by a majority of the company's shareholders) (citing Kerbs v. California Eastern Airways, Inc., 90 A.2d 652 (Del.1952) and Gottlieb v. Heyden Chem. Corp., 90 A.2d 660 (Del.1952)). Indeed, under Delaware law, "a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors." Michelson v. Duncan, 386 A.2d 1144 (Del.Ch.1979), aff'g in part and rev'g in part Michelson, 407 A.2d. 211, 219 (Del.Supr.1979). To be valid, a ratification must, in most circumstances, be made by a majority of the shareholders who have been "adequately informed of the consequences of their acts and the reasons therefor." Id. at 220. From the record, it appears that, at the time Hajjar was hired, Courtney Munson owned approximately 71 percent of Munson's stock. See Deposition of Courtney Munson, App. at 97. Courtney Munson was therefore the majority shareholder of Munson, and whether his actions could constitute a shareholder ratification of Hajjar's employment agreement such that it meets the stock option provisions of Delaware law must be considered by the district court.[3]
 
 
 20
 Munson also questions the district court's determination that another stock option plan controls his grant of options. In 1987, Munson's Board of Directors approved a stock option plan ("1987 Plan") which set forth the specific rules governing grants of stock options to employees. Unlike Hajjar's employment agreement, which states that he can exercise the options within seven years from the time they vest, the 1987 Plan provides that stock options end thirty days after an employee is terminated without cause. See App. at 18 p 13. In the district court, the appellees argued that the 1987 Plan was the only validly executed stock option plan and that it must control the stock options purportedly granted to Hajjar in the employment agreement. In its opinion denying Munson's first motion for summary judgment, the district court agreed, finding that "paragraph 3 of the Employment Agreement was never independently enforceable under Delaware law" and that the only way it could be enforced "would be under the terms of the 1987 SOP." Mem. Op. of Feb. 26, 1997 at 14. The court reached this conclusion despite the fact, as the court itself noted, that the employment agreement makes no reference to the 1987 Plan. Even if the 1987 Plan was the only valid plan under Delaware law, it is not clear that Hajjar knew of the existence of the 1987 Plan at the time the employment contract was drafted--when he learned of the existence of the 1987 Plan and whether he knew it was still in effect are facts contested by the parties. It would be unfair to Hajjar to impose requirements on his stock options which differ from those in his employment agreement and of which he may not have been aware. Because questions of fact exist regarding the applicability of the 1987 Plan, the district court's determination that it controlled is erroneous.
 
 
 21
 In summary, we find that questions of fact exist as to whether the Hajjar employment agreement was ratified by the Munson Board of Directors or by the shareholders of Munson, and whether the 1987 Plan controls Hajjar's options. Accordingly, the district court's determination that the employment agreement could not, as a matter of Delaware law, have granted Hajjar stock options must be reversed, and this issue remanded for further proceedings. On remand, the district court should consider whether the purported consent is admissible, giving whichever party that wants the document admitted a chance to lay a proper foundation.
 
 III. Counterclaims and Third-Party Claims
 
 22
 After determining that the 1987 Plan was the only valid plan by which stock options could have been granted to Hajjar, the district court turned to the counterclaims and third-party claims asserted by Hajjar against Munson and the third-party defendants. In Count I,[4] Hajjar alleged that Munson violated an implied duty of good faith in the employment contract by failing to perfect the stock options granted or promised to Hajjar in the contract and by terminating Hajjar's employment for the improper purpose of promoting a merger and avoiding the stock options granted to Hajjar. Count II asserted that Munson represented that Hajjar would have certain stock options by virtue of his employment and thereafter either negligently failed to take action necessary to perfect those options or intentionally and fraudulently promised the options while never intending to perfect them. It also states that Hajjar detrimentally relied on these representations of Munson. Count III alleges that Munson breached the terms of the employment contract with Hajjar by failing to do the necessary administrative and administerial acts to qualify Hajjar for stock options. Count IV charges that Courtney Munson, who was at all relevant times the president of Munson, hired Hajjar and promised him stock options on behalf of the company, and in so doing either misrepresented the terms of hiring or lacked the authority to commit to granting Hajjar stock options. Lastly, Count V alleges that Heartland and Acquisition, as a result of their subsequent merger with Munson, are liable for Munson's wrongful conduct.
 
 
 23
 The district court found that because the employment agreement did not constitute a valid stock option plan under Delaware law and because Hajjar "stubbornly insist[ed] upon relying on" it, Hajjar's counterclaims and third-party claims failed as a matter of law. With regard to Counts I, II, IV, and V, the court stated that "[b]y continuing to insist that [the 1987] plan does not apply to his Employment Agreement, Hajjar has foreclosed any possible relief under the law on these counterclaims and third-party claims." Since we have found that material issues of fact exist on the subject of the employment agreement's validity as a stock option plan and whether the 1987 Plan otherwise controls Hajjar's options, the grant of summary judgment on these counts must be reversed.
 
 
 24
 In addition, the district court's judgment in favor of the appellees must be reversed because it is premised on an erroneous reading of Hajjar's claims. Hajjar's claims all are based on a breach of the employment agreement he entered with Munson, not (as the district court found and the appellees assert) on any breach of the 1987 Plan. For example, Count I claims that Munson violated an implied duty of good faith contained "[a]s part of the Employment Agreement" by either failing to perfect the options it purportedly had granted Hajjar under the agreement or by terminating Hajjar for an improper purpose (e.g., to thwart the exercise of his options). See App. at 42-43. The 1987 Plan is not mentioned at all in this Count. The same is true with Counts II, IV and V: Count II alleges that Hajjar detrimentally relied on the stock options promised in the employment agreement; Count IV charges, in essence, that Courtney Munson lied to Hajjar (during their negotiation of the employment agreement) to secure his employment; and Count V alleges that Heartland and Acquisition are liable for Munson's wrongful acts by virtue of their merger with Munson (successor liability). The district court erred in finding that these Counts alleged breaches of the 1987 Plan, and erroneously granted summary judgment to the appellees on that basis.[5]
 
 
 25
 Hajjar's Third Counterclaim, which the district court discussed separately from the other counts, alleged that Munson "failed to do the necessary administrative and administerial acts to qualify Hajjar for employee stock options ... and thereby breached the contract of employment between Hajjar and Munson Corporation." App. at 45. The district court granted Munson summary judgment on this Count because it did not allege a breach of contract claim--the employment agreement contained no express or implied terms detailing what Munson had to do to perfect Hajjar's stock options. See Mem. Op. at 11. Our reading of this Count, however, shows that Hajjar alleges, in essence, that even assuming that the 1987 Plan controls the grant of stock options, Munson failed to carry through on its promise to give him stock options by failing to validly create such options under the 1987 Plan. See Mem. Op. at 10 (quoting from Hajjar's brief in opposition to summary judgment). While the employment agreement did not outline how options were to be granted to Hajjar, the 1987 Plan does contain such terms, and Hajjar is claiming that Munson's failure to follow the procedures in the 1987 Plan breached its promise to grant him options. As Hajjar states in his brief, this is a claim for a breach of the employment agreement by failing to legally set up the promised options, not a claim for a breach of the 1987 Plan, and the district court was similarly erroneous in granting Munson summary judgment on this claim.
 
 
 26
 In summary, we find that the district court incorrectly interpreted Hajjar's counterclaims and third-party claims, and as a result erroneously granted summary judgment to the appellees. Accordingly, we reverse the grant of summary judgment to Munson, Courtney Munson, Acquisition, and Heartland on Hajjar's counterclaims and third-party claims.
 
 CONCLUSION
 
 27
 Questions of fact exist regarding whether the Munson-Hajjar employment agreement meets the requirements of Delaware law in order to constitute a stock option plan and, if it does not, whether the 1987 Plan controls the options promised to Hajjar. Furthermore, the district court erroneously dismissed Hajjar's counterclaims and third-party claims based on its understanding that the claims were premised on violations of the 1987 Plan. Accordingly, we REVERSE the district court's judgment in favor of the appellees and REMAND this case for further proceedings not inconsistent with this opinion. Circuit Rule 36 shall apply on remand.
 
 
 
 [1]
 It is not entirely clear which party sought to put this document into evidence first, although the first copy we could find in the record was attached to Hajjar's response to Munson's first motion for summary judgment
 
 
 [2]
 Munson argues that even if the document is admissible, it is of little value because on its face it approves only of "acts" performed by corporate officers, not stock options granted by it. This semantic challenge is unpersuasive, since the very granting of stock options involved an "act" performed by Munson
 
 
 [3]
 As in the district court, Hajjar also asserts that because Munson is a closely-held corporation, Delaware law makes ratification of the employment agreement unnecessary. See Appellant's Brief at 1617 (citing Hessler, Inc. v. Farrell, 226 A.2d 708 (Del.1967)). We find, however, that the district court's discussion of this argument is correct
 
 
 [4]
 For simplification, we will refer to Hajjar's various claims as "Count I," "Count II," etc., rather than the designations used in Hajjar's Second Amended Counter and Third Party Claims (e.g., "Fourth Counter, Third-Party Claim")
 
 
 [5]
 In its brief to this court, the appellees state that all of Hajjar's claims fail to state a claim upon which relief can be granted. They provided no legal analysis of why this is so, and we will not consider such unsupported allegations