Leonard I. SCHREIBER, Plaintiff,

v.

R. G. BRYAN, W. E. Gipson, W. A. Hover, John D. Kirkland, William L. Liedtke, N. J. Luke, R. D. Rogers, Jr., Pennzoil Company and Pennzoil Offshore Gas Operators, Inc., Defendants.

Court of Chancery of Delaware, New Castle.

Submitted June 16, 1978.

Decided Sept. 6, 1978.

Joseph A. Rosenthal, of Morris & Rosenthal, P.A., Wilmington, and Bennett Frankel, New York City, for plaintiff.

James M. Tunnell, Jr., and Andrew B. Kirkpatrick, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and William C. Harvin, Hugh Rice Kelly, and C. Michael Watson, of Baker & Botts, Houston, Tex., for defendant, Pennzoil Co.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, for defendant, Pennzoil Offshore Gas Operators, Inc.

HARTNETT, Vice Chancellor.

In this stockholders' derivative action involving allegations of waste of corporate assets and diversion of corporate opportunity, defendants Pennzoil Company (Pennzoil) and Pennzoil Offshore Gas Operators, Inc. (POGO)[1] have moved for summary judgment. Defendants' motion is premised on their contention that plaintiff (Schreiber) lacks standing to assert such claims because Schreiber was not a stockholder at the time the alleged wrongdoing occurred and is also estopped from pressing his claims inasmuch as the intercorporate arrangements complained of were fully disclosed to stockholders, including Schreiber, before any shares were purchased. Defendants also urge that because of the ratification by a large majority of stockholders of the actions complained of, Schreiber has failed to meet his burden of demonstrating either the unfairness of the transactions or the loss of a corporate opportunity.

Surprisingly, the facts relating to this motion are relatively undisputed. POGO was formed in February 1970 by Pennzoil for the purpose of exploring for oil and gas in the Gulf of Mexico and for the purpose of enabling POGO to participate in a federal lease sale of offshore drilling sites held December 15, 1970. Public investors were solicited to invest directly in POGO but Pennzoil promised to buy out the public investors in the event that the enterprise should fail. Time has shown, however, that such assurances were unnecessary because POGO has proved to be a highly successful company.

By the very nature of its existence, POGO did not have any employees of its own, and the only property owned by it was oil and gas leases and drilling hardware. Thus, while the public provided the majority of the capital necessary for POGO's investments and operation,[2] Pennzoil provided *in toto* the necessary management and expertise including the services of contractors, attorneys, accountants and engineers, pursuant to a management contract. Plaintiff attacks the management contract, which was entered into between Pennzoil and POGO in November 1970 prior to the sale of any stock to the public and the terms of which were fully disclosed to prospective stockholders in POGO's 1970 prospectus. It called for Pennzoil to "administer all phases of the Company's [POGO] business". In return for these services, Pennzoil collected a fee of three percent of all cash disbursements by POGO plus three percent of all cash receipts, excluding certain specified transactions. The contract also obligated POGO to reimburse Pennzoil for all direct costs and expenses incurred for its benefit including such items as travel and subsistence expenses for Pennzoil personnel who might be assigned work away from their normal place of business, bonuses, expenses in connection with the acquisition and maintenance of oil and gas leases, and amounts paid to specialists employed to serve POGO, but specifically excluding payment of salaries to Pennzoil's employees. Pursuant to the management contract, Pennzoil was paid the following fees:

| | |
|---|---|
| 1970 and 1971 | $ 3,811,000. |
| 1972 | 2,285,000. |
| 1973 | 4,182,000. |

---

1. Pennzoil Offshore Gas Operators, Inc. has changed its corporate name to Pogo Producing Company as part of the stockholders approved plan to change POGO into an autonomous company with independent management. Under the terms of the plan, the management contract discussed infra between Pennzoil and POGO will be terminated on May 1, 1979.

2. After full conversion of debentures, Pennzoil would have 40% of the equity in POGO ($17,333,333) as a result of 21% of the total cash investment in POGO, while the public, which made an investment representing 79% of the total ($130,000,000) has 60% of the total equity ($25,966,666).

| | |
|---|---|
| 1974 | 7,489,000. |
| 1975 | 9,124,000. |
| 1976 | 9,866,000. |

Another feature of the Pennzoil-POGO relationship which plaintiff attacks was a tax allocation agreement which granted Pennzoil the right to include POGO in a consolidated federal income tax return through November 1, 1976, thereby allowing Pennzoil and its affiliates to benefit from the expected tax losses of POGO in the company's formative years. This arrangement, which again was fully disclosed and was entered into in 1970 before the sale of stock, netted Pennzoil a tax advantage of approximately $17,000,000.[3]

In 1972 management of POGO and Pennzoil were presented with the opportunity to acquire additional offshore leases, but decided that a second major financing of POGO was impractical and premature. Therefore, POGO's management recommended to its stockholders the creation of a second affiliate, Pennzoil Louisiana and Texas Offshore, Inc. (PLATO), whose operation and capital structure would be similar to that of POGO. The plan called for direct participation by POGO which would make a cash investment of 11.63% ($21,666,666) of the total cash investment in PLATO and would receive in turn 20% ownership in the equity of PLATO. Also, the 1970 management contract between Pennzoil and POGO was amended to allow Pennzoil, which under the 1970 contract was obligated to act exclusively for POGO, to administer the business of designated "qualified affiliates"[4] such as PLATO, and also expanded the area of interest of POGO's offshore

sites to include all federal acreage in the Gulf of Mexico offshore the United States with the exception of tracts already acquired by Pennzoil and adjacent tracts. However, the amendment to the management contract specifically did not permit qualified affiliates to acquire any interest in leases owned by POGO or in any tracts which POGO was financially able to acquire. The details of the amendment was exhaustively disclosed to POGO's stockholders.

At the 1972 annual meeting, the amendment was overwhelmingly approved by the holders of the 16,466,519 issued shares of Class B Common Stock by virtue of a vote of 10,180,464 (96% of the shares voting) in favor of the amendment and 390,254 (4% of the shares voted) shares against the amendment. Pennzoil deliberately refrained from voting its block of POGO stock.

Plaintiff first purchased 500 shares of POGO Class B Common Stock on April 28, 1971. The purchase was therefore made after the November 1970 offering and prior to the 1972 amendments to the management contract. It is unclear whether plaintiff voted his stock for the 1972 amendments, and I therefore must assume that he did not. Plaintiff acquired an additional 300 shares of POGO Class B Common Stock on August 3, 1972, a date subsequent to the adoption of the amendments at the April 28, 1972 Annual Stockholders Meeting.

I

Defendants contend that plaintiff's complaint concerns the transactions which occurred in 1970 before he became a stock-

---

3. The tax consequences of this agreement is explained in the affidavit of W. M. Brumley, Jr., a Vice-President of POGO since its inception, as follows: "At the statutory rate of 48%, the tax losses generated by Pogo during its formative years and utilized by Pennzoil and other members of its group amounted to a reduction in tax liability of approximately $28,200,000. On the other hand, the tax credits and other reductions in tax liability provided to Pogo under the tax allocation agreement by Pennzoil and the other members of its group total approximately $10,400,000. These amounts are subject to final adjustment in the event of any

change in tax liability including any change resulting from audit by the Internal Revenue Service."

4. A "qualified affiliate" is defined in the 1972 proxy statement to POGO stockholders as "any person, firm or corporation not less than 10% and not more than 40% of the equity of which shall be owned by Pennzoil and not more than 25% shall be owned by another Qualified Affiliate, assuming in each case full conversion or exercise of all outstanding securities which could be converted or exercised to acquire such equity.

holder, while plaintiff contends that it is the 1972 amendment and creation of PLATO for which he seeks relief and that he was thus a stockholder at the time the transaction of which he complains took place.

Both the rules of this Court, Chancery Court Rule 23.1,[5] and the Delaware General Corporation Law, 8 Del.C. § 327,[6] provide that only individuals who are stockholders at the time of the transaction complained of, or one who thereafter came into possession of the stock by operation of law, have standing to institute a derivative action. The policy behind the Statute and the Rule is to prevent so-called "strike suits" whereby individuals purchase shares in a corporation with litigious motives. The purpose of Section 327 was stated by Chancellor Seitz in *Maclary v. Pleasant Hills, Inc.*, Del.Ch., 109 A.2d 830, 833 (1954) as follows:

> It prevents a stockholder from attacking transactions completed before he becomes a stockholder. This statute was not passed to prevent the correction of corporate wrongdoing. It was designed principally to prevent the purchasing of stock to be used for the purpose of filing a derivative action attacking transactions occurring prior to such purchase.

See also *Elster v. American Airlines, Inc.*, Del.Ch., 100 A.2d 219 (1953); *Newkirk v. W. J. Rainey, Inc.*, Del.Ch., 76 A.2d 121 (1950); *Rosenthal v. Burry Biscuit Corporation*,[7] Del.Ch., 60 A.2d 106 (1948).

Another issue which has confronted this Court in the case of alleged continuing wrongs against a corporation, is the time at which stock must have been purchased in order to provide the stockholder with standing to prosecute his claims. The situation and test to be applied in such situations concerns whether the wrong complained of is in actuality a continuing one or is one which has been consummated. *Newkirk v. W. J. Rainey, Inc.*, supra. The difficulty with this formulation is the fact noted in *Newkirk* that "in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied", 76 A.2d at 123, and yet clearly such a result is not only unrealistic but moreover would defeat the statutory policy. Therefore, what must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt. Thus, in *Newkirk v. W. J. Rainey, Inc.* plaintiffs, none of whom owned stock in defendant corporation prior to 1947, brought suit for acts occurring in 1944 and 1945. Plaintiffs contended in that case that although the wrongs complained of were commenced before they acquired their stock, the plan of wrongdoing was not consummated until after they became stockholders when the merger of the corporations involved in the alleged scheme took place. The Chancellor, in holding that those plaintiffs who did not own stock at the time that the specific transactions complained of took place lacked standing, did so because the acts which plaintiffs wanted to have remedied all occurred prior to plaintiffs stock purchases, and because such acts were completed rather than being continuous. See also *Elster v. American Airlines, Inc.*, supra, in which it was held that the injury which plaintiff complained of was the granting of options rather than their exercise and thus the wrong was completed prior to plaintiff's ownership of the stock and did not, as plaintiff insisted, continue

---

5. Rule 23.1 states *inter alia*:

   In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law.

6. 8 *Del.C.* § 327 states:

   In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law.

7. *Rosenthal* and *Newkirk* were decided under Delaware Revised Code 1935, § 2083 A. the statute which was the forerunner of the present 8 *Del.C.* § 327.

until after such time as he became a stockholder of record. See also Folk, *The Delaware General Corporation Law*, § 327, p. 487.

## II

■ A second limitation on stockholder derivative actions somewhat analogous to the ownership proscription is called, for want of a better title, estoppel. A stockholder cannot complain of corporate action in which he has concurred. Thus, in *Elster v. American Airlines, Inc.*, supra, it was held that plaintiff had no standing to attack the issuance of stock options because the shares which she held were voted in favor of the options after plaintiff had received notice of all pertinent facts surrounding the options plan. See also *Goodman v. Futrovsky*, Del.Supr., 213 A.2d 899 (1965).

## III

Plaintiff urges that even if POGO's relationship to PLATO is disregarded, the complaint raises the issue of the propriety of the management contract between POGO and Pennzoil "as amended in 1972", since he claims that the three percent fee collected by Pennzoil for its services was excessive and had no bearing to Pennzoil's cost of rendering such services. Plaintiff also claims that the tax allocation agreement constitutes a breach of fiduciary duties and waste.

■ It is readily apparent that the terms of the management contract and the tax agreement existed and were fully disclosed as of November 1970, well in advance of plaintiff's stock purchase. The 1972 amendments did not in any way affect the management fee rate, and there was no amendment to the 1970 tax allocation agreement between POGO and Pennzoil.

Thus, these allegedly wrongful acts were consummated and were made known to plaintiff prior to the time that he became a stockholder. The 1972 amendments which plaintiff relies upon served only to reconfirm the earlier agreement as to the management fee and tax allocation without creating a new agreement upon which a cause of action could be based. To paraphrase the language of then Vice Chancellor Seitz in *Newkirk v. W. J. Rainey, Inc.*, supra, the 1972 amendment cannot be employed to transfer the completed acts of 1970 into continuing wrongs in order to override 8 *Del.C.* § 327. 76 A.2d at 124. The management contract and tax allocation agreement were entered into long before plaintiff became a stockholder of POGO. The terms of the agreements were fully disclosed in the initial prospectus. Plaintiff therefore is barred from attacking these agreements under 10 *Del.C.* § 327. It is therefore not necessary to reach the question of whether plaintiff must also be held to be estopped from challenging these agreements inasmuch as he purchased the stock with full knowledge of their terms. The fact that plaintiff purchased additional shares of stock, even after the 1972 amendments, is irrelevant to the issues presently before the Court. Defendants' Motions For Summary Judgment is therefore partially granted on the issues of the management fee and the tax allocation agreement.[8]

## IV

The next and more provocative issues raised in the Motion of defendant for summary judgment are whether Pennzoil, as controlling stockholder, in 1972, after plaintiff became a stockholder of POGO, committed waste and usurped a corporate opportunity from POGO by creating PLATO, and the effect of the ratification by POGO's

---

8. Although the resolution of the standing issue makes it unnecessary to reach the merits of the allegation that the tax allocation agreement constituted waste and a breach of Pennzoil's fiduciary duty, I nonetheless think it necessary to briefly note that defendants' use of *Meyerson v. El Paso Natural Gas Co.*, Del.Ch., 246 A.2d 789 (1967) to broadly support such an agreement may be unjustified. *Meyerson* is apparently limited to the fact that, unlike the instant action, the subsidiary was a wasting assets corporation which "could not, in all probability, have ever availed itself of the use of the loss." 246 A.2d at 794. Thus, the value of *Meyerson* is limited and is not on point with the facts before me.

stockholders of the transactions complained of. As previously noted, I must assume that plaintiff did not vote his stock in favor of the amendments. Plaintiff contends that by creating PLATO, Pennzoil has required POGO to accept PLATO as a partner which is in competition in bidding for offshore oil and gas leases, and that all of the leases acquired by PLATO would otherwise have been acquired by POGO. Furthermore, plaintiff contends that in furtherance of a plan to deprive POGO of an opportunity to expand its operations, Pennzoil exacted from POGO $640,000 as a fee for purchasing 10,833,333 shares of PLATO's Class A Common Stock at a price of $21,666,666, and that appropriation of this fee constituted a waste of POGO's assets. Plaintiff therefore argues that because Pennzoil controlled and dominated POGO by virtue of its 80% voting control, defendants have the burden of proving the intrinsic fairness of the creation of PLATO.

As might be expected, defendants' analysis and perspective of the creation of PLATO differs markedly from plaintiff's. First, defendants contended that POGO was not in a position to finance the acquisition of additional leases because of its recent 1970 capitalization and also because the disclosures which would have been required by the Securities and Exchange Commission would have been detrimental to POGO's business affairs. Next, defendants contend that notwithstanding the 1972 amendment and creation of PLATO, Pennzoil had by agreement reserved the right to acquire properties for its own account to the extent that POGO was financially unable to do so. Finally, defendants argue that the amendment setting forth POGO's obligations to PLATO actually improved POGO's position by expanding its area of interest beyond acreage offshore Louisiana to include, with limited exception, all offshore federal acreage in the Gulf of Mexico. Thus, it is defendants' position that in light of the stockholder ratification of the 1972 amendment and POGO's corresponding obligations to PLATO, plaintiff bears the burden of showing that defendant-Pennzoil invalidly exercised its business judgment, and that

the test of intrinsic fairness is inapplicable under these circumstances.

■ Although the general rule of law is that stockholder ratification cures a voidable wrong, *Kerbs v. California Eastern Airways*, Del.Supr., 90 A.2d 652 (1952), and that such ratification relates back to the time of the act and is thus the equivalent of original authority, *Hannigan v. Italo Petroleum Corporation of America*, Del.Supr., 47 A.2d 169 (1945); *Michelson v. Duncan*, Del. Ch., 386 A.2d 1144 (1978); it is also the rule of law that only unanimous stockholder ratification is sufficient where it is alleged that there has been a waste or gift of corporate assets. *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962); *Kerbs v. California Eastern Airways*, supra; *Michelson v. Duncan*, supra; 2 Fletcher, *Cyclopedia of Corporations* § 764 (Perm.Ed.Rev.1969).

■ The question of whether or not corporate waste has occurred is, I find, inextricably linked to the issue of whether Pennzoil diverted a corporate opportunity away from POGO. To put the matter simply, if there was a usurpation of POGO's opportunity to expand its oil and gas exploration interests because of the creation of PLATO by Pennzoil, then the payment of a $640,000 fee to Pennzoil for the right of POGO to invest in PLATO was a payment toward the loss of a valuable opportunity and thereby constituted waste. Thus, the initial factual question to be resolved is: "Was there a loss of a corporate opportunity?" A companion issue is upon whom the burden of proof falls on the question of corporate opportunity.

The law as to corporate opportunity has been stated as follows:

"[W]hen there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with

the corporation's interest and may not take the opportunity for himself." *Equity Corporation v. Milton*, Del.Supr., 221 A.2d 494, 497 (1966). See also *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939), and *Johnston v. Greene*, Del.Supr., 121 A.2d 919 (1956). While these cases all involved opportunities utilized by individuals, they do establish that the essential ingredients to finding that a corporate opportunity has been usurped are: (1) that the opportunity is either essential to the corporation or is one in which it has an interest or expectancy, (2) that the corporation is financially able to take advantage of the opportunity itself, and (3) that the party charged with taking the opportunity did so in an official rather than individual capacity. See *David J. Greene & Co. v. Dunhill Int'l, Inc.*, Del. Ch., 249 A.2d 427 (1968).

■ The obvious inference to be drawn from these criteria is that a claim that a corporate opportunity has been wrongfully taken is wholly dependent upon the facts presented. As stated in *Johnston v. Greene*, supra, at 923:

> The application of these principles depends on the facts. Whether or not the director has appropriated for himself something that in fairness should belong to his corporation "is a factual question to be decided by reasonable inference from objective facts." *Guth v. Loft*, supra, 23 Del.Ch. 277, 5 A.2d 513.

■ I find that the defendants have the burden of proving that POGO was not stripped of a corporate opportunity. The defendants have thus far failed to sustain this burden. The applicable test is intrinsic fairness rather than the business judgment rule. Although under the business judgment rule an aggrieved party bears the burden of showing gross and palpable overreaching (See *Wolfensohn v. Madison Fund, Inc.*, Del.Supr., 253 A.2d 72 (1969), and *Meyerson v. El Paso Natural Gas Co.*, Del.Ch., 246 A.2d 789 (1967), when the test of intrinsic fairness is deemed to apply, the burden shifts to the defendants to show the entire fairness of the transaction under the careful watch of the courts. *Singer v. Magna-*

*vox Co.*, Del.Supr., 380 A.2d 969 (1977); *Sterling v. Mayflower Hotel Corp.*, Del. Supr., 93 A.2d 107 (1952); and *David J. Greene & Co. v. Dunhill Int'l, Inc.*, supra. The traditional prerequisite for invoking the intrinsic fairness test, in a parent-subsidiary context, is that the parent controls the making of the transaction and the fixing of its terms. This rule has been narrowed, however, to require that there also be a showing of self-dealing, i. e., that the parent benefitted to the exclusion of and to the detriment of the minority stockholders of the subsidiary. *Sinclair Oil Corporation v. Levien*, Del.Supr., 280 A.2d 717 (1971), and *Getty Oil Company v. Skelly Oil Company*, Del.Supr., 267 A.2d 883 (1970).

■ All the elements necessary to invoke the intrinsic fairness rule are present in the case before me. Pennzoil totally dominated and controlled POGO's management at the time of the 1972 transactions and set the terms of the PLATO arrangement. Thus, although Pennzoil chose not to exercise its voting control, it nonetheless controlled the corporate machinery of POGO, and may have stood to gain at the expense of its subsidiary. The possible detriment to POGO's stockholders is the alleged loss of a corporate opportunity and purported waste of assets. The benefit received by Pennzoil is not only the $640,000 fee resulting from the transaction, but also the creation of a second subsidiary from which to receive hydrocarbons for refining.

## V

■ Questions of fact, however, remain as to whether or not POGO was in fact denied a corporate opportunity. Two elements indicating the usurpation of corporate opportunity are present. POGO had an interest in the offshore sites which were leased by PLATO upon its creation, and Pennzoil was able to create PLATO and obtain money from POGO which was needed for investment in PLATO as a result of its control and management of POGO. Defendants contend, however, and the sworn affidavits of the officers of POGO declare, that the third essential element necessary

to find a loss of corporate opportunity is absent, viz., that POGO was financially able to utilize the opportunity. It is unclear from the present record, however, whether POGO was in fact financially unable to take advantage of the opportunity for expansion. The opportunity may have been sufficiently unique and valuable enough to warrant POGO to muster the required capital regardless of the difficulty, and defendants have not yet borne the burden of showing that the decision that POGO would not seek the needed capital was totally justified. The domination of Pennzoil over POGO, not only in the very creation of the latter but also in its day-to-day operation, also requires a careful scrutiny of the alleged wrongdoing, and such scrutiny is not possible from the present record.

To return to the issue of waste, this Court stated in *Gottlieb v. McKee*, Del.Ch., 107 A.2d 240, 243 (1954):

> The determination of whether or not there has been in any given situation a gift of corporate assets does not rest upon any hard and fast rule. It is largely a question of fact.

In the instant action, a question of fact must be resolved before it can be determined if waste occurred. If Pennzoil exacted the corporate opportunity from POGO waste may have occurred. If waste did occur the non-unanimous stockholder ratification is not dispositive of plaintiff's claim.

■ When a material issue of fact exists, a motion for summary judgment must be denied. *Gamble v. Penn Valley Crude Oil Corp.*, Del.Ch., 104 A.2d 257 (1954); *Nash v. Connell*, Del.Ch., 99 A.2d 242 (1953); *Hurtt v. Goleburn*, Del.Supr., 330 A.2d 134 (1974).

Accordingly, defendants' Motion is granted in part as to the issue of the impropriety of the management contract and tax allocation agreements and denied as to the issue of whether the 1972 amendments constituted waste of assets of POGO. Defendants should submit a proposed order.

## ON MOTION FOR REARGUMENT

On September 6, 1978, I ruled on the motion for summary judgment sought by certain of the defendants. The motion for summary judgment was granted in part and denied in part. After my decision, defendants-Pennzoil and POGO sought reargument on the ground that they should not be required to bear the burden of proof to show the fairness of the 1972 PLATO transaction. In their motion for reargument defendants primarily rely on *Gottlieb v. Heyden Chemical Corp.*, Del.Supr., at 90 A.2d 660, and 91 A.2d 57 (1952), especially the Opinion at 91 A.2d 57. For the purposes of the motion for reargument defendants do not deny that all the elements are present which would normally require the intrinsic fairness test to be applied by the Court in reviewing the transaction, but they argue that the second *Gottlieb* opinion (91 A.2d 57) holds that if there has been independent (but non-unanimous) shareholder ratification of the transaction, the burden of proof is shifted to a plaintiff who is alleging wrongdoing and changes the question of proof from the intrinsic fairness test to the business judgment rule.

I agree that *Gottlieb* stands for the legal proposition that where waste is not an issue stockholder ratification "freshens the atmosphere" and the burden of proof shifts to the objector.

I do not agree, however, that the "freshen the atmosphere" rule espoused in the second *Gottlieb* case (91 A.2d 57) applies where there is a showing that waste may be present. Nor did this Court agree in *Gottlieb v. McKee*, Del.Ch., 107 A.2d 240 (1954) citing *Kerbs v. California Eastern Airways, Inc.*, Del., 91 A.2d 62. The second *Gottlieb* case, at 91 A.2d 57, does not discuss waste and involved stock options. Stock options have been held not to usually constitute waste. *Michelson v. Duncan*, Del.Ch., 386 A.2d 1144 (1978); *Dann v. Chrysler Corp.*, Del.Ch., 198 A.2d 185 (1963), aff'd sub nom. *Hoffman v. Dann*, Del.Supr., 205 A.2d 343 (1963), cert. den. 380 U.S. 973, 85 S.Ct. 1332, 14 L.Ed.2d 269.

In *Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311, 321 (1952) it was stated:

Since the payment . . . constitutes an illegal gift of corporate funds and amounts to waste, the fact that the contract was ratified by the stockholders does not cure its illegality.

See also Folk, *The Delaware General Corporation Law*, § 144, page 84.

■ I find the rule in Delaware to be that a waste of corporate assets is incapable of ratification without unanimous stockholder consent. *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 605 (1962). I am aware of no contra authority.

■ Where waste of corporate assets is alleged and sufficient facts to support the allegation are present in the record to require an inquiry into the transaction, the Court is charged with the responsibility of examining all the facts surrounding the acts, notwithstanding independent stockholder ratification.

■ The rule of law, therefore, to be applied in the trial of this case is that if the Court finds that ordinary businessmen might differ as to whether or not the subsidiary corporation was adequately compensated, the Court must validate the transaction. *Michelson v. Duncan*, supra; *Saxe v. Brady*, supra. The burden is upon defendants, however, to come forward with the facts relating to the fairness of the transaction.

This is consistent with the holding in *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556, 567 (1977) where this Court said:

. . . it has been held that a waste of corporate assets cannot be ratified by stockholders, except by unanimous vote. *Kerbs v. California Eastern Airways, Inc.*, Del.Supr., 33 Del.Ch. 69, 90 A.2d 652 (1952); *Saxe v. Brady*, 40 Del.Ch. 474, 184 A.2d 602 (1962). As summarized at *Folk, The Delaware General Corporation Law*, § 144 at 84–85 (1972):

". . . the validating effect of [stockholder] ratification would be overturned only by the objectors' demonstrating that the transaction amounted to waste, which, as previously indicated, could not be effectively ratified. But if in fact waste of assets is alleged, the court will examine a transaction, notwithstanding independent stockholder ratification, but it will limit its scrutiny to determining whether the consideration is so inadequate that no person of sound, ordinary business judgment would deem it worth what the corporation paid; on this test the court will uphold the transaction if ordinary businessmen might differ on the sufficiency of its terms."

See also *Gottlieb v. Heyden Chemical Corp.*, 33 Del.Supr. 82, 90 A.2d 660 (1952); *Saxe v. Brady*, supra.

It is undisputed that there was not unanimous stockholder ratification here. Defendants' motion for reargument is not supported by the cases cited by them and is therefore denied. So ordered.

My September 6, 1978, ruling on the defendants' motion for summary judgment is also supported by O'Neal, *Oppression of Minority Shareholders*, p. 171 (1975) as follows:

Whenever a parent, instead of causing a subsidiary to act in a way that might be detrimental to the subsidiary's interests, itself denies a business opportunity or some other benefit to a subsidiary, arguably the burden can appropriately be placed on the subsidiary's minority shareholders to show that the subsidiary is entitled to share in the opportunity or benefit. But to tie the minority's burden to the business judgment rule clearly is improper. That rule was designed to apply to contracts or other transactions between a corporation and outsiders, where the corporation's management is usually free from conflicting interests and can be depended on the act for the corporation's benefit. It is hardly an appropriate rule to apply in a self-dealing context, that is, to actions by a parent-fiduciary that benefit the parent but might unfairly deprive a subsidiary or its minority shareholders of benefits to which they are entitled.