BRAMBLES USA, INC., a Delaware
corporation, Plaintiff,

v.

Barry B. BLOCKER, Melvyn Bell, Edwin
E. Walhof, George D. Combs, Charles
C. Robertson, William H. Wilson, Jack
W. Forrest, Jim L. Hanna, Theodore L.
Stebbins, C. Warner, Jr., Donald R.
Blocker, G & L Ditz Living Trust, G.
Ditz, Jr. Family Trust, John A. Ditz,
Smedjan Enterprises, Ltd., W.D. Bain,
Jr., Anne A. Bain, Nancy B. Cota, Kitt-
ler B. Zibart, Pauline T. Bain, Donald
E. Fraser, Steven J. Anderson and
David L. Morrell, Defendants,

and

Environmental Systems Company, a
Delaware corporation, Nominal
Defendant.

Civ. A. No. 89–681 LON.

United States District Court,
D. Delaware.

Feb. 16, 1990.

R. Franklin Balotti and C. Stephen Bigler of Richards, Layton & Finger, Wilmington, Del. (T. Livingston of Mayer, Brown & Platt, Chicago, Ill., of counsel), for plaintiff.

Stephen J. Rothschild and Randolph K. Herndon, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants Bell, Walhof, Combs, Robertson, Wilson, Forrest, Hanna, Stebbins and Warner.

Bruce M. Stargatt, Josy W. Ingersoll and Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., and Neisar, Pahl, Cecchini & Gosselin, San Francisco, Cal., of counsel), for Blocker, Blocker, G & L Ditz Living Trust, G. Ditz, Jr. Family Trust, Ditz, Smedjan, Bain, Jr., Bain, Cota, Zibart, Bain, Fraser, Anderson and Morrell.

Thomas P. Preston, Judith N. Renzulli, John L. Olsen and David C. Weiss of Duane, Morris & Heckscher, Wilmington, Del., for nominal defendant Environmental Systems.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiff Brambles USA, Inc. ("Brambles") commenced this derivative action on behalf of Environmental Systems Company ("Ensco") against the Ensco directors and the shareholders of Exceltech, Inc. ("Exceltech") for violations of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 and Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), as well as state law fraud and breach of fiduciary duty claims.

The Complaint, Docket Item ("D.I.") 1, challenges the agreement entered into between Ensco and Exceltech whereby Exceltech merged with Ensco Environmental Services, Inc. ("EES"), a wholly owned subsidiary of Ensco. Pursuant to the Merger Agreement, the Exceltech shareholders acquired, among other things, the option to receive Ensco stock with a total value of 7.3 million dollars. Brambles seeks rescission of the merger or, in the alternative, money damages because the merger was purportedly procured by fraud. In addition, Brambles seeks to enjoin the Exceltech shareholders from selling Ensco shares acquired pursuant to the merger.

Presently before the Court are motions to dismiss by Ensco, the Ensco directors and by the Exceltech shareholders. All Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) and 23.1 asserting that: (1) Plaintiff lacks standing to bring this action; (2) Plaintiff has not alleged with particularity sufficient reasons why demand was wrongfully refused by the corporation; (3) Plaintiff failed to make a demand on the corporation with respect to the Modification Agreement; and (4) Plaintiff is an inadequate representative of the derivative class. In addition, Ensco and the Ensco directors seek dismissal under Federal Rule of Civil Procedure 9(b) for failure to allege fraud with sufficient particularity.

## I. FACTS [1]

The dispute in this case centers on a merger between Exceltech and EES, a

---

**1.** For the purposes of the present motions to dismiss, the Court has accepted as true the Complaint's and the First Amended Verified Complaint's well-pleaded factual allegations, drawing all reasonable inferences in favor of the Plaintiff. In addition to the factual allegations of the Complaint, the Court has also considered all exhibits attached to the Complaint. 5 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1357 at 593 (1969); 2A J. Moore, J. Lucas and G. Grotheer, Moore's Federal Practice ¶ 12.07[2.–5] at 12.68 (2d ed. 1989); *Quiller v. Barclays American/Credit, Inc.* 727 F.2d 1067,

wholly owned subsidiary of Ensco. An analysis of the facts surrounding that merger is therefore necessary.

In early 1980, Ensco, a Delaware corporation in the business of providing hazardous waste disposal services, became aware that Barry Blocker ("Blocker"), then President of McKesson Chemical Group ("McKesson") was interested in Ensco as a possible acquisition target. D.I. 1 Exhibit ("Ex.") C at 4. Impressed with Blocker's expertise and experience in the hazardous waste disposal industry, Melvyn Bell ("Bell"), Chairman of Ensco's Board, asked Blocker to join Ensco's Board. *Id.* Because of potential conflicts between McKesson and Ensco, Blocker declined the offer.

When Blocker left McKesson in 1986, Bell offered him the positions of President and Chief Executive Officer of Ensco. Blocker again declined but accepted Bell's offer to join the Ensco Board. *Id.* After he had accepted the position, but before being officially elected, Blocker became aware of Exceltech, a hazardous waste disposal company involved in site assessment and remediation plan development. Blocker inquired of Ensco whether it would be interested in having him pursue Exceltech on Ensco's behalf. *Id.* Upon receiving a negative answer, Blocker negotiated to acquire Exceltech on behalf of himself and his investment group. *Id.* At some point during the negotiations, Ensco reversed its position and made an offer for Exceltech. Their bid, however, was unsuccessful. Blocker and his group ultimately purchased Exceltech for 2.4 million dollars. D.I. 1 at ¶ 24. At the close of the transaction on May 1, 1987, Blocker owned 22% of Exceltech and had become its Chairman of the Board and Chief Executive Officer. *Id.* at ¶ 25.

Over the next ten months, Exceltech earned revenues of 4.8 million dollars and incurred losses of nearly $530,000 leaving it with a $450,000 deficit in retained earnings and a book value of $109,000. *Id.* at 26.

In December of 1987, Bell approached Blocker to discuss the possibility of a merger between Exceltech and Ensco's wholly owned subsidiary, EES. D.I. 1, Ex. C at ¶ 10. According to a Special Committee of Ensco's Board appointed to review the transaction, the Ensco Board felt at the time that Exceltech offered a solution to the strategic concerns posed by the newly created EES.[2] *Id.* at ¶ 6. In early 1987, however, before contemplation of the Exceltech merger, Ensco held itself out as having "the capability of offering and providing complete 'turnkey remediation services from initial site assessment to complete closure of any site.'" Amended Complaint, D.I. 27 at ¶ 59.

---

1069 (11th Cir.1984), *aff'd and reinstated en banc,* 764 F.2d 1400 (11th Cir.1985).

**2.** The Ensco Report of the Special Committee states:

In the latter part of 1987, Messrs. Bell and Forrest [another Ensco Board member], as well as various members of the Board, had four strategic concerns regarding the new EES. These concerns were shared, although their importance may have been ranked differently, by various Board members. The four strategic concerns, which are to some extent, interwoven, were:

(a) EES was in the "back end" of the remediation business, bidding for contracts to dispose of hazardous waste. It needed "front end" capability (i.e. the capability to do site assessments and devise remediation plans), so that EES could position itself to offer the "turn-key" remediation services that customers wanted. This would not only provide increased volume but better margins as well since EES would not always have to bid against others for the disposal phase.

(b) There was a concern that the then existing EES management did not have the skills necessary to integrate the acquisitions Ensco had already made into a single remediation company and to oversee its growth to $100 million and beyond.

(c) The incineration and remediation business being very capital intensive, Ensco would have a continuing need to raise additional capital. Ensco was viewed by stock market analysts as a hazardous waste disposal company, while the stock market favored remediation companies. The needed capital might be available on more favorable terms to EES, as a remediation company, than to Ensco.

(d) EES had no presence in the West, especially in California, which was viewed as an important and growing market for remediation services.

Negotiations were conducted primarily by Bell and Jack W. Forrest ("Forrest"), both members of Ensco's Board on Ensco's behalf and by Blocker on Exceltech's behalf. Blocker provided Bell and Forrest with Exceltech's financial statements. D.I. 1, Ex. C at ¶ 18. Forrest also asked Blocker to provide Exceltech's financial projections. Upon receiving the projections, Forrest stated that they were too conservative and asked Blocker for a more optimistic analysis. D.I. 1, Ex. C. at ¶ 16. In assessing the price to be paid for Exceltech, Bell and Forrest had discussions with the Chicago Corporation concerning the public market values of remediation companies and received an analysis of publicly traded remediation companies. Id. at ¶ 15. Apart from value based on price, however, Bell and Forrest gave great weight to the strategic value Exceltech would provide Ensco. Id.

The ultimate price agreed upon for the acquisition of Exceltech was approximately 10 million dollars. D.I. 1 at ¶ 33. In exchange for all of the outstanding shares of Exceltech, the Exceltech shareholders received 2.7 million dollars in short term notes plus 19.4% ownership interest in EES. The Exchange/Put Agreement entered into between Ensco and the Exceltech shareholders (the "Exchange/Put Agreement") in conjunction with the Merger Agreement provided that if EES did not complete a firmly underwritten public offering (the "IPO") of its common stock before October 27, 1989, then the Exceltech shareholders would have the option of exchanging their 19.4% interest in EES for 7.3 million dollars worth of Ensco stock. Id.

The Merger Agreement was presented to the full Board on March 3, 1988. The Board members had received a packet of materials the day before the meeting containing Exceltech company brochures and a letter of intent outlining the terms of the proposed transaction. D.I. 1, Ex. C at ¶ 17. The Board members did not receive, nor did they review any Exceltech financial statements. Id. They instead relied upon Bell and Forrest with respect to the reasonableness of the price. Id. at ¶ 18. Had the directors been given the Exceltech financial statements for the eleven month period ending April 3, 1988, they would have learned that Exceltech had total losses of $650,000, a negative stockholder's equity of $11,000 and a negative tangible net worth of more than $800,000.

The Board did not focus its attention on the financial condition of Exceltech but instead focused mainly on how the proposed transaction addressed the EES strategic issues that had previously been identified by various Board members. Id.

At the meeting, Blocker described the operations of Exceltech. He also disclosed at the meeting that he had a substantial financial interest in the transaction. Id. at 19. But he did not disclose that he and his group had recently purchased Exceltech for 2.4 million dollars. D.I. 1 at ¶ 41. In addition, Blocker predicted that Exceltech's revenues for the fiscal year ending April 30, 1988, would be in the range of 7 million dollars. D.I. 1 at ¶ 38. This information might have been inaccurate.[3]

At the March 3, 1988, meeting, the Exceltech transaction was unanimously approved by the Board with Blocker abstain-

3. The Report of the Special Committee addresses this point more fully. The Report states at paragraph 20:

The minutes [of the March 3, 1988, Board meeting] state that Mr. Blocker advised the Board that Exceltech would have revenues in the $7 million range for the fiscal year ended April 30, 1988, and that Exceltech's historical growth rate had been 60—65% per year. As Brambles has pointed out, this statement of revenues for the year ended April 30, 1988, if made, would not have been accurate. Mr. Blocker believes that he might have said that the revenues as of April

30, 1988, would be at a $7 million annual rate, which would have been true. Mr. Forrest is unsure whether the minutes accurately record what Mr. Blocker said, or whether Mr. Blocker might have referred to the annual rate as of April 30 or the revenues for the year ended October 31, 1988 (Ensco's fiscal year end). Either of which would have been in the seven million dollar range. Mr. Gregory [an Ensco Board member] after reviewing his own notes of the meeting, believes that Mr. Blocker said that on April 30, 1988, revenues would be at a $7 million annual rate.

ing from voting. Following the merger, which became effective May 1, 1988, Blocker took charge of running the joint operation.

Within six months of the merger it became apparent that there were problems with EES that the prior management had failed to recognize. D.I. 1, Ex. C at ¶ 22. As a result of these problems, EES lost more than 3 million dollars, $500,000 of which was attributable to Exceltech. D.I. 1 at ¶ 44. In light of these losses, the Ensco Board in December of 1988 approved implementation of a plan to discontinue EES operations effective October 31, 1988, and to sell off its assets, including Exceltech. *Id.* at 46; D.I. 1, Ex. C at ¶ 23.

The practical effect of the decision to discontinue EES operations was that there would be no IPO with respect to EES, and the Exceltech shareholders would have the alternative right as consideration for the merger, to exchange their EES stock for Ensco stock on October 27, 1989.

On February 19, 1989, Brambles, a Delaware corporation with its principal place of business in Chicago, Illinois, entered into an agreement with Ensco (the "Purchase Agreement") whereby Brambles would purchase 3 million shares of Ensco stock for a total price of 30 million dollars and would lend Ensco an additional 30 million dollars to be repaid in three years. In addition, Ensco would issue Brambles a warrant entitling Brambles to purchase 2,142,857 shares of unissued Ensco common stock at an exercise price of $14 per share. D.I. 1 at ¶ 8.

During the negotiation of the Purchase Agreement, Ensco's management, particularly Bell and Forrest, represented to Brambles that Exceltech could be sold for 8 million dollars. Based on that representation, Brambles concluded that the acquisition of Exceltech for 10 million dollars was fair and reasonable. *Id.* at ¶ 48.[4]

On March 15, 1989, Brambles purchased the original 3 million shares pursuant to the Purchase Agreement. On July 5, 1989, Brambles purchased an additional 200,000 shares raising their beneficial ownership of Ensco to approximately 30%.

Due to Ensco's unsuccessful efforts to sell Exceltech, in August of 1989 Brambles sought the advice of an investment bank regarding the value of Exceltech. At that point, Brambles was advised that Exceltech was worth 4 to 4.5 million dollars. *Id.* at ¶ 49. Upon further investigation of Ensco's books and records, Brambles concluded that the Exceltech acquisition, and the Exchange/Put Agreement in particular, were unfair, had been procured by fraud and were voidable at the option of Ensco. *Id.* at ¶ 50. Pursuant to this conclusion, on October 24, 1989, Brambles sent a letter to the Ensco Board requesting the creation of a Special Committee to investigate the matter and take appropriate action. *Id.*

Brambles requested that the Special Committee be composed of its three representatives on the Board and the three other Board members who were not members of the Board at the time of the transaction in question. On October 26, 1989, the Board appointed Messrs. Hanna, Warner and Stebbin to the Special Committee and delayed the exchange of stock pursuant to the Exchange/Put transaction until the Special Committee had conducted its investigation. *Id.* at ¶ 51. Brambles objected to the composition of the Special Committee because it did not include its representatives. Brambles also asserted that because Mr. Hanna was a director of a bank to whom Bell owed money and because Bell personally owed Mr. Warner money, the Special Committee was neither disinterested nor independent.[5] On October 31, 1989, Brambles formally demanded that the Board either declare the Exchange/Put Agreement void and refuse to go forward with it or, in the alternative, take action against Blocker, Bell, Forrest and the other

4. From the pleadings it is not clear whether Brambles had requested additional financial information about Exceltech at this time.

5. Interestingly, Messrs. Hanna, Warner and Stebbin were recommended by Brambles to serve on the Special Committee.

directors who approved the transaction. *Id.* at ¶ 53.

Despite the demand, the Special Committee commenced their investigation. It retained and consulted with independent outside counsel and conducted interviews of Blocker, Bell, Forrest, Charles C. Robertson and William H. Wilson, two outside directors who were present at the March 3, 1988, Board meeting, and Watt Gregory, Ensco's independent general counsel. D.I. 1, Ex. C at 3. Pursuant to its investigation, the Special Committee found that the Ensco Board had acted within the proper bounds of their business judgment in approving the Exceltech transaction and that the Exceltech transaction was fair to Ensco. *Id.* at 13.

The full Ensco Board met on November 30, 1989, to discuss the report of the Special Committee, copies of which had been given to the Board members the previous day. Over the objections of the Brambles representatives, the Board endorsed the Special Committee's conclusions and decided to go forward with the Exchange/Put transaction.

Prior to the exchange pursuant to the Exchange/Put Agreement, Ensco and the Exceltech shareholders modified their agreement to rectify a tax complication brought to Ensco's attention by Bramble's October 24, 1989, letter. Pursuant to this Modification Agreement, Ensco agreed to diligently defend Blocker and the other Exceltech shareholders from any challenges to either the Modification Agreement or the Exchange/Put Agreement. The Ensco Board approved the Modification Agreement at the November 30, 1989, Board meeting.

6. The Federal Rule provides, in pertinent part, that:

> In a derivative action brought by one or more shareholders ... to enforce a right of a corporation ... the corporation ... having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder ... at the time of the transaction of which the plaintiff complains....

Fed.R.Civ.P. 23.1 (1989).

## II. DISCUSSION

Defendants argue that the Plaintiff has no standing to bring this derivative action because Plaintiff was not a stockholder at the time of the transaction of which it complains. Defendants' point to the transaction date of April 27, 1988, or at the latest, May 1, 1988, the effective date of the merger. Because Brambles' agreement to purchase 3 million shares was entered into in February, 1989, and the actual purchase was not until March 15, 1989 (with 200,000 additional shares purchased on July 5, 1989), Defendants argue that Brambles could not be considered a shareholder of Ensco as of April 27, 1988. The Plaintiff argues even though the Exchange/Put Agreement was dated April 27, 1988, and the effective date of the merger was May 1, 1988, the Agreement could not have been consummated until October 27, 1989, which was a date after Brambles purchased its stock.

Both Federal Rule of Civil Procedure 23.1 [6] and Section 327 of the Delaware General Corporation Law [7] require, *inter alia,* that a derivative plaintiff be a shareholder of the corporation at the time of the transaction of which he complains.[8] The plaintiff must also maintain that status throughout the lawsuit. *See Heit v. Tenneco, Inc.,* 319 F.Supp. 884, 886 (D.Del. 1970); *Issen v. GSC Enterprises, Inc.,* 538 F.Supp. 745, 752 (N.D.Ill.1982). A primary purpose of the contemporaneous ownership requirement is to curtail strike suits by prohibiting potential plaintiffs from buying into a lawsuit through the purchase of shares of stock in a corporation after an alleged "wrong" has occurred. *Newkirk v. W.J. Rainey, Inc.,* Del.Ch., 76 A.2d 121, 123 (1950); *Maclary v. Pleasant Hills,* Del.

7. Section 327 provides, *inter alia,* that "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains...." 8 Del.C. § 327 (1983).

8. The parties have not complained of any inconsistency between federal and state law and all parties argue decisions from the courts of the State of Delaware. *See* D.I. 23 at 24 n. 4; D.I. 19 at 14. The Court finds that following either would produce the same result.

Ch., 109 A.2d 830, 833 (1954).[9]

■ In certain cases, the so-called "continuing wrong" exception to the contemporaneous stockholder rule allows one who acquired his stock after the transaction of which he complained to maintain a derivative suit on the theory that the alleged "wrong" commenced before the stock acquisition but was continuing and not executed and final until sometime after the plaintiff acquired his stock. *See, e.g., Newkirk*, 76 A.2d at 123; *see also* D. Drexler, L. Black & A. Sparks, Delaware Corporation Law and Practice, § 42.03[1] at 42–6. (1990).[10] Section 327 is to be liberally construed in cases where the primary purpose of eliminating the abuses associated with derivative suits will not be frustrated. *Jones v. Taylor*, Del.Ch., 348 A.2d 188, 191 (1975).[11] The continuing wrong exception should not be applied in all situations where a transaction is challenged because "in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied." *Newkirk*, 76 A.2d at 123.[12] "[W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *Schreiber v. R.G. Bryan*, Del.Ch., 396 A.2d 512, 516 (1978).[13]

■ The issue in this case is whether the transaction of which the Plaintiff complains occurred when the merger became effective, May 1, 1988, or whether it was a

---

**9.** Originally, the federal courts employed the rule as "a means of discouraging the collusive practice of transferring stock to a nonresident for the purpose of manufacturing federal diversity jurisdiction in order to litigate a pre-existing claim owned by the corporation in a federal court." 7C C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1828 at 64 (1986) ["Wright & Miller"].

**10.** "The federal courts generally have rejected the ... 'continuing wrong' notion.... Rather, plaintiff has been barred from complaining about events of this character as of the time of the initial event, which antedated plaintiff's gaining shareholder status." 7C Wright & Miller § 1828 at 65.

**11.** *Jones* involved the issue of whether the particular equitable interest held by the plaintiff was sufficient to give stockholder status and allow a derivative action.

**12.** In *Newkirk*, prior to the plaintiffs' acquisition of stock in the corporation, certain corporate opportunities were allegedly diverted by directors pursuant to a "preconceived" plan. The diversions involved the purchase of stock in two natural gas corporations to ultimately allow the directors to develop an integrated natural gas transmission system. Also, on April 9, 1948, pursuant to the preconceived plan, these two corporations were eventually merged with the corporation in which the stockholders held stock. The plaintiffs acquired stock in the corporation in October of 1947. The plaintiffs complaint concerned the stock purchases prior to the time they were stockholders. Vice Chancellor Seitz decided that the wrong complained of was not continuing, each of the stock purchases was a separate transaction completed prior to the plaintiffs acquisition of stock. The merger, which occurred after they acquired the stock was not a continuation of the wrong alleged. The Chancery Court said "the allegations

... refer back to the alleged original wrongs, all of which occurred before these plaintiffs acquired their stock. Those wrongful acts cannot by the specious device of employing appropriate language be transferred into continuing wrongs for the purpose of overriding" the predecessor of Section 327. *Id.* at 124.

**13.** In *Schreiber*, Vice Chancellor Hartnett held that where the terms of the challenged management agreement and tax agreement between Pennzoil Company and Pennzoil Offshore Gas Operators existed and were fully disclosed prior to the time the plaintiff acquired stock in the corporation, the plaintiff was barred from attacking those agreements because he lacked derivative plaintiff standing. Certain amendments which were made after the plaintiff acquired his stock did not affect the management fee rate and did not address the tax allocation agreement. Accordingly, the Chancery Court decided that the allegedly wrongful acts "were consummated and were made known to plaintiff prior to the time that he became a stockholder." *Schreiber*, 396 A.2d at 517. *See also Chirlin v. Crosby*, Del.Ch., C.A. No. 6632, slip op., Hartnett, V.C., 1982 WL 17872 (Dec. 7, 1982) (No continuing wrong found where the complaint, fairly read, challenged a transaction that occurred prior to plaintiffs stock ownership. In 1966 the Chairman of the defendant corporation formed a company that would supply certain bridge services enabling transport from Paradise Island to Nassau. The plaintiffs acquired their stock in 1978. In 1980, the defendant acquired an additional ownership interest in the Bridge Company then sold it all for a substantial profit. The plaintiff alleged this was one continuing wrong. The Court said that while the plaintiff has alleged two distinct transactions, the basic challenge to each was the diversion of corporate opportunities which, if it took place, occurred in 1966.)

continuing wrong not consummated until sometime after Brambles became a holder of Ensco stock. In *Lavine v. Gulf Coast Leaseholds*, Del.Ch., 122 A.2d 550 (1956), the Chancery Court applied the continuing wrong exception to a stock exchange agreement which expressly conditioned its consummation on it being "approved and ratified by resolution adopted by the holders of record of a majority" of the corporation's voting shares. *Id.* at 551. The Chancery Court held that the "transaction ... was legally completed when the stockholders voted their approval." *Lavine*, 122 A.2d at 552; *cf. Kaufman v. Albin*, Del. Ch., 447 A.2d 761, 764 (1982) (holding that the transaction commenced when the directors adopted certain resolutions and was not consummated until shareholders tendered into the tender offer because until that occurred the transaction was not viable). Since the plaintiff had acquired his stock prior to the time the shareholders approved the exchange, the plaintiff was not barred from maintaining derivative status. *Id.* The shareholder approval in *Lavine* was considered by the Chancery Court to be "a prime condition precedent." *Id.*

The present case is distinguishable from those cases such as *Lavine*. In those cases, until the shareholders approve the resolution submitted by the directors, there is no final viable transaction of which a complaint could be made. Brambles asserts that the shareholder approval cases are analogous because here the alternative exchange provision which was part of the consideration for the merger could not be exercised until the eighteen months had passed without an IPO. Brambles' comparison of the nonoccurrence of an IPO within the eighteen months and the approval of a board resolution by shareholders is flawed. In the latter situation, until the shareholders approve the resolution, there is no corporate action. In the former situation, as Brambles concedes, the end result of the Exchange/Put Agreement was already fixed when the merger became effective. *See* D.I. 1 at ¶ 33. As consideration for the merger, the Exceltech shareholders would receive either 7.3 million dollars in Ensco shares or whatever value the EES

shares would be worth after an IPO. Which of the two events contemplated by the agreement would actually occur was yet to be decided but that it would be one of these two events was a foregone conclusion at the time the Exchange/Put Agreement was signed and became effective. Thus, it is obvious that what Brambles is really challenging is the fairness of the Merger Agreement and not the exercise of the option.

For similar reasons, Brambles' reliance on *Kaufman* is misplaced. In that case, until the requisite number of shareholders tendered pursuant to the tender offer there was no transaction. As the Court said, until that time the transaction complained of was "subject to extinction." *Kaufman*, 447 A.2d at 764. The resolutions of the board in *Kaufman* were simply not binding until it was consummated by the shareholders tendering the requisite number of shares into the tender offer. In the case *sub judice*, the merger in May, 1988, fixed the method of payment. That it may have provided an alternative method of payment does not mean that the Exchange/Put Agreement and the Merger Agreement were not binding on the parties. Thus it was not a resolution as in *Kaufman;* rather, it was a fixed contract.

Brambles also relies on *Maclary*, 109 A.2d 830. In *Maclary* a resolution of the board authorized the issuance of shares in a corporation with the stock certificates to be issued "at once." *Id.* at 834. The Chancery Court found that the transaction was not complete until the certificates were actually issued. *Id.* Chancellor Seitz said that Section 327 "was not passed to prevent the correction of corporate wrongdoing." *Id.* at 833. The rationale for finding a continuing wrong in *Maclary* was that to find otherwise would allow "inexcusable inaction on the part of corporate personnel [that] might make it less likely that wrongdoing would be discovered.... [Also, it] would sanction an application of the statute not required by its language and not fairly required to effectuate its purpose." *Id.* The directors had no discretion in actually issuing the stock certificates, yet they inex-

cusably chose not to issue them. The Chancellor was reading the statute liberally and decided not to allow the wrongful failure of the corporation to issue the stock certificates to go unchallenged.

Reliance on *Maclary* by Brambles is misplaced. In *Maclary*, until the stock certificates were issued, the wrong continued. The last essential corporate action to effect the board's resolution to issue the stock did not occur until the issuance of the stock certificates.[14] In this case, Brambles is not complaining that the failure to have the IPO was inexcusable inaction. Once effective, the Exchange/Put Agreement provided that either there would be an IPO within eighteen months or the option holders could exercise their rights.

In *Elster v. American Airlines*, Del.Ch., 100 A.2d 219 (1953), on September 12, 1950, the defendant granted options to certain of its executives to purchase shares in the company at a certain price. Additional options were granted on May 21, 1952, involving a slightly higher price per share. All of the options were exercisable immediately upon their issuance. These options, which were alleged to be a waste of corporate assets, were subject to the approval of the shareholders. The plaintiff became a stockholder in June of 1950. The Chancery Court, determining that the action was not an individual one but rather was derivative, stated that "I fail to see that there is any difference between the type of action in a suit to cancel shares of stock already issued and one where the prayer is to enjoin the issuance of stock under a contract made by the corporation. In each case the wrong for which complaint is made is the action of the corporation in entering into the contract." *Id.* at 222. The plaintiff had argued that until all of the options were exercised, the wrong would be con-

tinuing. The Chancery Court rejected the argument and said the wrong complained of was not continuing. "The wrong of which plaintiff complains is the option contract, not the purchase price and sale of stock pursuant thereto.... [H]is complaint is a lack of consideration in the granting of the options." *Id.* at 224; *see also Maclary*, 109 A.2d at 833 (distinguishing *Elster* as a case involving stock options where the transaction was complete on the issuance of the option and not continuing until the issuance of stock pursuant to the options). The Chancery Court stated that "[a]ssuming that the individual defendants did wrong to the Corporation by entering into the contract it does not follow that they committed any wrong in carrying out the contract once it had been made. Indeed, had they not done so, the Corporation would presumably have been subject to liability for breach of contract." *Elster*, 100 A.2d at 224, *quoting Levitan v. Stout*, 97 F.Supp. 105, 119 (W.D.Ky.1951).[15] The reasoning of *Elster* is most persuasive.

Brambles argues it is "challenging as improper the issuance of Ensco common stock." D.I. 23 at 27. What Brambles seeks, however, is recision of the Exchange/Put Agreement. D.I. 1, "Prayer for Relief" at (b). By seeking recision of that Agreement, Brambles tacitly acknowledges that it is the Exchange/Put Agreement that is the transaction of which it complains.[16] The underlying basis of this is that from Brambles' perspective, the Exceltech merger and the Exchange/Put Agreement appear to be a bad deal. *Cf. Elster*, 100 A.2d at 224 ("complaint is lack of consideration in the granting of the options"); *FMC Corp. v. R.P. Scherer Corporation*, Del.Ch., C.A. No. 6889, slip op., Longobardi, V.C., 1982 WL 17888 (Aug. 6,

---

**14.** The Chancellor also noted that under Delaware law "directors cannot evaluate their own services and determine the amount of stock to be issued therefor." *Maclary*, 109 A.2d at 835.

**15.** *See also Nickson v. Filtrol Corporation*, Del. Ch., 262 A.2d 267, 270 (1970) where the wrong complained of involved the purchase by the corporation of certain bonds from a director at an allegedly inflated price, the Chancery Court

found no continuing wrong in the retention of the bonds while their value decreased or in misrepresentations to the public as to the value of the bonds because these were "consequences or results flowing from the alleged acquisition of the [bonds], and are not independent transactions within the meaning of § 327."

**16.** This follows the words of Rule 23.1 and 8 Del.C. § 327. *See supra* notes 1 and 2.

1982).[17] The wrong, if any, however, occurred when the merger became effective in May, 1988, thereby finalizing the conditional aspects of the agreement.

To allow Brambles to obtain derivative plaintiff standing would also frustrate at least one purpose of the contemporaneous shareholder requirement. As a matter of policy, one who buys shares with knowledge of a purported wrongdoing should not be permitted to bring suit to challenge that wrongdoing. *FMC Corp.*, C.A. No. 6889 at 5–7. While Brambles may complain that they could not have known that the Exceltech merger and the Exchange/Put Agreement were a bad deal until they became a stockholder and did a "books and records" inspection, the fact remains that by the time Brambles had purchased its stock the merger had occurred and Brambles could have conducted a more stringent inquiry prior to purchasing its large equity stake in Ensco.

### III. CONCLUSION

Brambles lacks standing to pursue this lawsuit in a derivative posture. The underlying transaction of which it complains was complete at the time of the effective date of the merger. The fact that one of two possible events could have happened pursuant to the merger (*i.e.*, either an IPO or exercise of the option) does not mean that the wrong complained of continued until the expiration of eighteen months or until the options were exercised. That the situation evolved to permit the exercise of the options was simply a consequence of a fixed contractual agreement dating back prior to the time Brambles became a shareholder of Ensco. That Agreement and the Merger Agreement were known by Brambles prior to the time it bought its interest in Ensco. Accordingly, Brambles' Complaint must be dismissed.

---

**17.** In *FMC Corp.*, the plaintiffs sought a preliminary injunction staying a stockholders meeting to vote on a board approved amendment to the certificate of incorporation providing for supermajority voting requirements. The meeting was scheduled after the board approved the amendments, but before the plaintiff purchased its stock. The Court stated that "FMC wants to contest what the Directors in Scherer had approved and were submitting to the stockholders for approval. Why should FMC be heard to complain about what they bought? The Proxy Statement had been public for 16 days." *FMC Corp.*, C.A. No. 6889 at 7. The Court found that the transaction complained of was completed when the Board approved the supermajority voting amendments. It was not the actual adoption of the amendments that were complained of; rather, the plaintiff complained of the Board's action. This is why the wrong was found not to continue up to the time of eventual shareholder approval. The plaintiff's request for an injunction was denied on the grounds that it failed to carry its burden on irreparable injury. *Id.* at 10. In another case, Chancellor Brown said:

> it is not the merger itself that constitutes the wrongful act of which plaintiff complains but rather it is the fixing of the terms of the transaction which will be finalized by the consummation of the merger which provides the foundation for the suit. So viewed, there is no continuing wrong which occurred prior to the date on which plaintiff purchased her stock.

*Brown v. Automated Marketing Systems, Inc.*, Del.Ch., C.A. No. 6715, 1982 WL 8782, Brown, C. (Mar. 22, 1982).